### IN THE

# SUPREME COURT

### OF THE

## STATE OF NEW-YORK,

### IN JANUARY, 1847.

---

## FREEMAN *vs.* THE PEOPLE.

The common law, as well as the statute, (2 *R. S.* 697, § 2,) forbids the trial, the sentencing, or the punishment of an insane person for a crime, while he continues in that state.

But one capable of rightly comprehending his own condition in reference to the proceeding against him, and of conducting his defence in a rational manner, is not insane within the meaning of the rule, though on some other subjects his mind may be deranged.

Where insanity in a person indicted is alleged or suspected, the most discreet and proper method of determining the question in an important case, is a trial by jury; but other modes may be adopted in the discretion of the court. *Per* BEARDSLEY, J.

Where a jury empannelled to try whether a person indicted for murder was then insane, were instructed by the court that they were to decide "whether the prisoner knew right from wrong; and if he did, then he was to be considered sane;" *held* that the charge was erroneous.

And the jury having found that the prisoner was "sufficiently sane in mind and memory to distinguish between right and wrong;" *held* that the verdict was defective.

The test of insanity, when set up to prevent a trial, is whether the prisoner is mentally competent to make a rational defence: and, when alleged as a defence to an

indictment, it is whether at the time of committing the act, he was laboring und *u* such mental disease as not to know the nature and quality of the act he w.*t* doing, or that it was wrong.

A bill of exceptions does not lie to review questions determined upon the trial of a collateral issue; and therefore where exceptions were taken upon a preliminary trial of a question of *present insanity,* which were incorporated in a bill of exceptions taken upon the trial of the indictment; *held* that such exceptions were not properly before the court.

On such preliminary trial, the defendant is not entitled to peremptory challenges but challenges for cause may be made.

A juror, to be competent, must not only be indifferent as to the issue he is to determine, but impartial between the parties; and where triers of a challenge for favor to a juror were sworn to find whether the juror was indifferent " upon the issue joined," that qualification being objected to, the oath was held erroneous.

Where a juror is set aside by a peremptory challenge, the party on whose behalf it was made cannot on error insist upon an erroneous ruling of the court upon t'.e previous trial of a challenge of the same juror for cause.

A challenge to a juror for cause, must distinctly specify the ground of challenge or it may be disregarded. *Per* BEARDSLEY, J.

It is a good cause of principal challenge that the juror has formed and expressed an opinion that the prisoner is guilty.

An *impression* that the prisoner is guilty, or a hypothetical opinion adverse to him, though not a ground of principal challenge, may be given in evidence to show bias, on a challenge for favor; and it is then for the triers to determine whether the juror is indifferent or not.

And it is erroneous for the court to instruct the triers, as matter of law, that a hypothetical opinion of the guilt of the prisoner will not disqualify a juror.

Where a challenge for principal cause on the ground that the juror had formed and expressed an opinion that the prisoner was guilty, was overruled by the court after evidence given in its support, and the juror was then challenged for favor, and the same evidence having been submitted to triers, they were instructed that the latter challenge was in the nature of an *appeal* from the judgment of the court upon the facts; *held,* that the charge was erroneous.

The finding of a jury upon a preliminary issue, to the effect that the prisoner was *then sane,* cannot be taken into consideration upon the question of insanity set up as a defence upon the trial of the indictment.

And where the court, on the trial of the indictment, refused to permit evidence to be given that the prisoner was insane at any time after the finding of the verdict upon the preliminary issue, and excluded the opinions of medical witnesses formed from an observation of the prisoner after that time, as to his insanity when the offence was committed; such ruling was held erroneous.

Where a prisoner was tried for murder four months after the crime was alleged to have been committed; *held* that it was competent for the prisoner to prove by professional witnesses that he was insane at the time of the trial, with a view to establish the defence of insanity when the act was done.

ERROR to the Cayuga oyer and terminer. The plaintiff in error, on the eighteenth day of May, 1846, was indicted in the court of general sessions of Cayuga county, for the murder of John G. Van Nest, which was alleged to have been perpetrated on the twelfth day of March preceding, at the town of Fleming, in that county. The sessions, pursuant to the statute, sent the indictment to the oyer and terminer; and on the first day of June following, the district attorney proceeded to arraign the prisoner in that court upon the indictment, when his counsel pleaded in his behalf that he was in a state of insanity; which allegation was denied by the district attorney. The prisoner was then remanded, and was again brought into court on the 24th day of the same month, when the court " to inform its conscience, and to ascertain whether the prisoner was sufficiently sane to be required to plead to and to be tried upon said indictment, directed a jury to be empannelled from the regular jury summoned, and attending the said court to try the said issue." The proceedings in empannelling the jury, and upon this preliminary trial, are sufficiently stated in the opinion of the court. On the fifth day of July following, the jury delivered their verdict in these words: " We find the prisoner sufficiently sane in mind and memory to distinguish between right and wrong." The prisoner's counsel excepted to the verdict, and requested the court to instruct the jury to find whether the prisoner was sane or insane. The court refused to give such instructions, and decided that the verdict should be received, and the prisoner's counsel excepted. On the following day, the sixth of July, the prisoner was arraigned on the indictment, when his counsel objected to his being required to plead, on the ground that the verdict on the preliminary issue was defective in not directly determining the question before the jury. The court overruled the objection, and the prisoner's counsel excepted. To the question whether he demanded a trial upon the indictment, the prisoner answered " no ;" but the court directed a plea of not guilty to be entered, and proceeded to empannel a jury

The name of Argelos Taylor was drawn, and that person appeared and was challenged by the prisoner's counsel

" for principal cause." The juror was sworn in support of the challenge, and testified that he had read an account of the testimony taken before the coroner's jury, and the evidence of a witness taken before a magistrate, which were published in a newspaper, and had seen a plan of the house of the deceased, where the murder was alleged to have been committed, and that he had made up his mind, and it was then his settled and deliberate opinion that the prisoner was guilty of the murder of Van Nest, and that he had expressed this opinion, and he thought he had done so a number of times. He said his opinion might be changed by proof on the trial, but that it would require proof to change it; that he had heard that it was alleged that the prisoner was insane, but from the preparations which he had heard the prisoner had made for the commission of the murder, and from the fact of his flight after it was committed, he had formed an opinion that he was sane. On his cross-examination he said his opinion was based wholly upon the reports he had read, and that he should think, if he served as a juror, his mind would be open to a fair consideration of the case; and that he would not render a verdict of guilty in consequence of the opinion he had formed, if there were no evidence on the part of the people. To a question put by a member of the court, he said that if the prisoner was proved to be guilty, as he had heard, he should find him guilty; and that the only foundation of his opinion was the reports he had heard. The evidence on this question being closed, the court overruled the challenge, and the prisoner's counsel excepted. The counsel for the prisoner then challenged the juror "for favor;" and the bill of exceptions proceeds to state that "the question of his indifference as a juror was thereupon submitted to triers upon the evidence given upon the challenge for principal cause." The court charged the triers as follows: "On the question of the prisoner's insanity, the trial upon the preliminary issue has settled but one point, and that is that he was sane at the time that verdict was rendered. The law presumes a man sane until the contrary is clearly proved. The juror indulging an opinion that the prisoner was sane at the time

Freeman *v.* The People.

the act was committed, being but a legal presumption, does not disqualify, unless the juror had attended a trial upon that issue and had heard the testimony and upon that had made up his mind. The case of this juror is distinguishable from the case of Hopkins, challenged by the attorney general and found not indifferent, inasmuch as Hopkins had formed his opinion from personal observation of the prisoner, and not from information. In this case the opinion is formed from information. If this information came from those who knew the facts, the opinion would be stronger. If you find the opinion of the juror so strong as that in your judgment it would influence his action, and thus disqualify him, then he is not indifferent. On the other hand, if you find the opinion a floating one and such as to be removed by the evidence, and that he will give an impartial verdict from the testimony—if it is founded upon a supposition that certain facts be true, then it is a hypothetical opinion and does not disqualify, as that presupposes that the facts are to be proved. The rule for determining the indifference of jurors, by which this court has been governed, is laid down in the opinion of Chief Justice Marshall, on the trial of Aaron Burr." The court read from the opinion referred to as follows: "Were it possible to obtain a jury without any prepossessions whatever respecting the guilt or innocence of the accused, it would be extremely desirable to obtain such a jury; but this perhaps is impossible, and therefore will not be required. The opinion which has been avowed by the court is, that light impressions which may fairly be supposed to yield to the testimony that may be offered—which may leave the mind open to a fair consideration of that testimony—constitute no sufficient objection to a juror; but that those strong and deep impressions which will close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him. Those who try the impartiality of a juror, ought to test him by this rule. They ought to hear the statement made by himself, or given by others, and conscientiously determine, according to their best judgment, whether, in general, men under such circumstances

ought to be considered as capable of hearing fairly and of deciding impartially on the testimony which may be offered to them, or as possessing minds in a situation to struggle against the conviction which that testimony might be calculated to produce. The court has considered those who have deliberately formed and delivered an opinion on the guilt of the prisoner as not being in a state of mind fairly to weigh the testimony, and therefore as being disqualified to serve as jurors in a case." (*Burr's Trial, vol.* 1, *p.* 416.)

The court proceeded in the charge to the triers as follows: "If the juror says he has formed and expressed a deliberate opinion, he is not indifferent; but you are to look at the whole examination and say whether he has such an opinion as will resist the evidence. If he has, he is not indifferent. If you believe his mind is open to a fair and impartial consideration of the evidence, then he is a proper juror. Courts would at all times be bound to declare a juror not indifferent when he has stated he had formed a deliberate opinion." One of the triers then inquired of the court whether an opinion formed from reading the accounts in a newspaper could be called a deliberate opinion; to which the court responded as follows: "It is difficult to understand how a man can be said to form a deliberate opinion upon a mere matter of information; but that is a question for the triers. The resort to triers by the prisoner's counsel is in the nature of an appeal from the opinion of the court upon the facts. The question of law is the same before the court as before the triers in some respects. The court apply the law and exclude the juror when there is no dispute about the facts as to the state of the juror's mind. In this case it is for the triers to determine upon the indifference of the juror upon the whole evidence. The triers must find whether the opinion which the juror has formed will have a controlling effect upon him in opposition to the evidence in favor of the prisoner. If it will, then he is not indifferent." The prisoner's counsel excepted to every part of the charge. The triers found that Taylor stood indifferent as a juror, and the prisoner's counsel then challenged him peremptorily.

Benjamin Beach was drawn as a juror, and was challenged "for principal cause," and was examined before the court at length, as to the state of his mind regarding the prisoner's guilt. The effect of his testimony was, that he had heard a part of the evidence at the coroner's inquest read, and had formed an impression that the prisoner was guilty; but said that sometimes he had doubts of it, and that he should be guided by the evidence, if sworn as a juror. He also said that from all the accounts he had heard, he was inclined to think the prisoner was sane. The court overruled the challenge, to which an exception was taken on behalf of the prisoner, and a challenge "for favor" was interposed. Triers were appointed, to whom the evidence which the juror had given, was submitted. The court charged the triers in the same manner as in the case of Taylor, before mentioned, and they pronounced him indifferent. He was then sworn as one of the jury for the trial of the indictment.

Other persons drawn as jurors were challenged and found indifferent, and were then set aside by a peremptory challenge interposed on behalf of the prisoner.

The panel was at length completed; and the prosecution proved that the prisoner killed Van Nest on the night of the twelfth of the preceding March, in the manner described in the indictment.

The defence was, that the prisoner was insane, or an idiot, when he committed the act, and upon that question much evidence was given. Some of the witnesses to establish the defence, had known the prisoner before the homicide was committed; but several physicians were called, who saw him for the first time during the trial of the indictment, (which continued until the latter part of July,) and who had examined him with a view to form professional opinions, as to the state of his mind. Charles Van Epps, a physician, had known the prisoner from a child, and had visited him in prison since the homicide, both before and after the sixth day of July, to ascertain his mental condition. He was of opinion that the prisoner was insane, and in giving his reasons for that opinion, spoke of an interview he had with him subsequently to the sixth day of July then instant, (the day

the verdict on the preliminary issue was rendered :) when an objection was interposed by the counsel for the people, and the witness was stopped by the court, who remarked "that the question of *present insanity* had been tried, and a verdict rendered on the sixth instant, and that such question as to present insanity could not be then retried; that the question then on trial, in connection with the murder, was whether the prisoner was sane at the time of the commission of the crime, and that the evidence of insanity must be confined to facts before and at the time of committing the act, and up to the sixth day of July instant, when the verdict of sanity was rendered." To this ruling the prisoner's counsel excepted. The following question was then asked by the prisoner's counsel : "What is your opinion as to whether the prisoner at the bar is insane?" The counsel for the people objected, and the court sustained the objection, and the prisoner's counsel again excepted; and then proposed the following question : "What is your opinion as to whether the prisoner at the bar was insane at any time previous to the sixth day of July instant?" The witness answered, "I think he was insane before and at that time," and stated various facts and circumstances occurring before the day mentioned in corroboration of his opinion; when the prisoner's counsel asked him the following question : "Have you, since the sixth day of July instant, made any observations which went to confirm your opinion as to his insanity previous to that time?" This was objected to by the counsel for the people, and court sustained the objection and overruled the question, and the prisoner's counsel excepted.

Thomas Hun, also a physician and professor in a medical college, was called as a witness for the prisoner, and testified that he arrived and saw the prisoner for the first time, in his cell, in prison, on the fifteenth day of July, and had seen him since in court, and had heard a small part of the evidence in the cause. The prisoner's counsel proposed to prove by the witness that, from conversations with the prisoner, and his appearance, and from the testimony the witness had heard, the prisoner was, in his opinion, insane at this time, and at the

Freeman *v.* The People.

time of committing the homicide.   The counsel for the prose-
cution objected, and the court decided that the witness might
give his opinion as to the sanity of the prisoner " upon facts
within his knowledge before the sixth day of July instant, or
from the personal appearance of the prisoner, but not from any
conversations with him since the sixth of July instant, nor
from the testimony in the cause." The prisoner's counsel ex-
cepted, and the witness was examined under the restrictions
prescribed by the court ; and in the course of that examination,
the prisoner's counsel asked the witness the following question :
" Did you make a personal examination of the prisoner since
your arrival here ?" The counsel for the people objected, and
the court sustained the objection, and the prisoner's counsel
excepted. The following questions were also put to the wit-
ness on behalf of the prisoner, and were in like manner sever-
ally objected to and excluded by the court : " Is it your opinion,
founded upon your personal examination of the prisoner since
the sixth day of July instant, that he was insane on the twelfth
day of March last ?" " Is it your opinion, founded upon your
personal examination of the prisoner since the sixth day of July,
that he is now insane ?" In the discussions which took place
in reference to the examination of the witness, the prisoner's
counsel insisted that the verdict upon the preliminary issue, was
not evidence upon the trial of the principal issue, or if it was,
that it was not conclusive.

James McNaughton, also a physician and a professor in a
medical college, was examined on behalf of the prisoner.   He
came to Auburn, and first saw the prisoner, on the fifteenth
day of July.   He was not permitted to testify as to his belief
that the prisoner was then insane, or to speak of his belief as to
his being insane at the time of the commission of the homicide,
from any knowledge or information gained by him of, or about,
the prisoner, by a personal examination made since the sixth
day of July instant ; and exceptions to the ruling of the court
in this respect, were taken by the prisoner's counsel.

Several professional and other witnesses were examined on
behalf of the prosecution, who had known or had seen and

examined the prisoner previous to the verdict on the prelim-
inary issue, and who severally gave their opinions that he was
sane.

The jury found the prisoner guilty, and the court sentenced
him to be executed on the eighteenth day of September then
next.   A bill of exceptions, comprising various points excepted
to on the trial of the preliminary issue, as well as the excep-
tions taken upon the trial of the indictment, was signed by the
judges of the court of oyer and terminer.

A writ of error, to operate as a stay of proceedings, was al-
lowed by Mr. JUSTICE BEARDSLEY, in vacation, on the 14th
day of September, 1846.

*W. H. Seward,* for the plaintiff in error, argued the follow-
ing, among other propositions :

1. The exceptions taken on the preliminary issue, are before
the court.

2. The prisoner was entitled to peremptory challenges in
empanneling the jury upon that issue.

3. The oath administered to the triers was improper.

4. The test prescribed by the court in its charge to the jury,
who tried the preliminary issue, whether the prisoner knew right
from wrong, was erroneous.

5. The verdict on that issue was defective, in not finding
the fact to be tried, and should not have been received.

6. The court erred in overruling the challenge of Taylor
for principal cause, and the exception in that respect is still
available, although he was afterwards set aside by a peremp-
tory challenge.

7. A like error was committed in determining the challenge
of Beach, who eventually became one of the jury.

8. The charge of the court to the triers, upon the challenges
of Taylor and of Beach, was erroneous.

9. The court erred in its several decisions as to the admissi-
bility of testimony, and in restricting the range of the exami-
nation of the professional witnesses for the prisoner.   The
verdict upon the preliminary issue was not evidence upon the

Freeman *v.* The People.

trial of the indictment, and should not have been allowed to have any effect on that trial.

*L. Sherwood,* (district attorney,) *& J. Van Buren,* (attorney general,) for the people.

*By the Court,* BEARDSLEY, J.   The prisoner was tried at a court of oyer and terminer, held for the county of Cayuga, and found guilty of the crime of murder; upon which verdict sentence of death was pronounced.  In the course of the trials, preliminary and final, a multitude of exceptions were taken by the prisoner's counsel, which, with the record of the conviction and sentence, have been brought into this court by writ of error.   These exceptions, or such of them as the counsel for the prisoner supposed to be available, were argued at the last term of this court, and having since been examined and considered with care and deliberation, we are now prepared to dispose of them by rendering judgment on the case before us.

When the prisoner was brought before the court of oyer and terminer, to be arraigned on the indictment, a plea, that he was then insane, was interposed by counsel on his behalf, which, being denied by the public prosecutor, a jury was impannelled to try the issue so joined.   On the trial of this issue, various objections were made and exceptions taken by the prisoner's counsel, and the first question to be decided is, whether these exceptions can be re-examined on a writ of error.

The statute declares that "no insane person can be tried, sentenced to any punishment, or punished for any crime or offence, while he continues in that state."  (2 *R. S.* 697, § 2.) This, although new as a legislative enactment in this state, (3 *id.* 832,) was not introductory of a new rule, for it is in strict conformity with the common law on the subject.  "If a man," says Sir William Blackstone, "in his sound memory commits a capital offence, and before arraignment for it he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall

not be tried: for how can he make his defence? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if, after judgment, he becomes of non sane memory, execution shall be stayed, for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution. Indeed," it is added, "in the bloody reign of Henry the eighth, a statute was made which enacted, that if a person being *compos mentis*, should commit high treason, and after fall into madness, he might be tried in his absence, and should suffer death, as if he were of perfect memory. But this savage and inhuman law was repealed by the statute of 1 and 2 Ph. and M. c. 10. For, as is observed by Sir Edward Coke, ' the execution of an offender is for example, *ut pœna ad paucos, metus ad omnes perveneat;* but so it is not when a madman is executed; but should be a miserable spectacle, both against law, and of extreme inhumanity and cruelty, and can be no example to others.'" (4 *Bl. Com.* 24.) The true reason why an insane person should not be tried, is, that he is disabled by an act of God to make a just defence if he have one. As is said in 4 *Harg. State Trials*, 205, "there may be circumstances lying in his private knowledge, which would prove his innocency, of which he can have no advantage, because not known to the persons who shall take upon them his defence." The most distinguished writers on criminal jurisprudence concur in these humane views, and all agree that no person, in a state of insanity, should ever be put upon his trial for an alleged crime, or be made to suffer the judgment of the law. A madman cannot make a rational defence, and as to punishment, *furiosus solo furore punitur.* (1 *Hale, P. C.* 34, 35; 4 *Bl. Com.* 395, 6; 1 *Ch. C. L.* ed. 1841, *p.* 761; 1 *Russ. on C.* ed. 1845, *p.* 14; *Shelf. on Lunacy*, 467, 8; *Stock. on Non Com.* 35, 6.)

The statute is explicit that "no insane person can be tried," but it does not state in what manner the fact of insanity shall be ascertained. That is left as at common law: and although, in the discretion of the court, other modes than that of a trial

by a jury may be resorted to, still, in important cases, that is regarded as the most discreet and proper course to be adopted. (*See the authorities last referred to. Also* 1 *Hawk. P. C. by Curwood, p.* 3, *and note; Steph. C. L.* 3, 4, 280, 334.)

At common law the only regular mode of redress for errors occurring on criminal trials, was by motion for a new trial, in the court where the trial was had, unless the error was in some matter which formed a part of the record, when it might be reviewed, after judgment, by writ of error. Bills of exception, by which questions of law, made and decided on such trials, may be brought up and reviewed in a higher court, were unknown to the common law, although now allowed by a statute of this state. But the statute is limited to exceptions taken on the trial of the main issue, and does not reach such as are made on the trial of a preliminary or collateral question. The words are, "on the trial of any indictment, exceptions to any decision of the court may be made by the defendant, in the same cases and manner provided by law in civil cases." (2 *R. S.* 736, § 21. *See also* 3 *id.* 849.) A trial of the question of present insanity is not *a trial of the indictment,* but is preliminary to such trial. The object, in such a case, is simply to determine whether the person charged with an offence and alleged to be insane, shall be required to plead and proceed to the trial of the main issue of guilty or not guilty. The statute does not authorize exceptions to be taken on such preliminary trial; and if errors occur they must be corrected, if at all, as at common law, by the court which committed them. For this reason, none of the exceptions taken by the prisoner's counsel on the trial of the preliminary issue in this case can be regarded as regularly before us; nor could they, if held to be well taken, constitute a ground for reversing the judgment of the court below.

This part of the case might here be dismissed; but I choose not to do so, lest an implication should be supposed to arise that, in the opinion of this court, the preliminary trial was conducted throughout with regularity and according to law.

On the preliminary trial the counsel for the prisoner claimed

the right to challenge jurors peremptorily, as it is conceded to exist on the trial of the main issue. This the court refused to allow, and, it seems to me, correctly. Peremptory challenges are allowed in favorem vitæ, and, at common law, are restricted to the main issue, in which the life of the party is in jeopardy, and cannot be made on the trial of any collateral issue whatever. (2 *Hale's P. C.* 267, ch. 35; *Bac. Ab. Juries,* E 9; *Foster's C. L.* 42; 4 *Bl. Com.* 353, 396; *Co. Lit.* 156, b.; *The King* v. *Radcliffe,* 1 *W. Bl. R.* 3, 6.) To the like effect is the statute, which secures to "every person arraigned and put on his trial for any offence punishable with death, or with imprisonment in a state prison ten years, or any longer time," the right, "peremptorily to challenge twenty of the persons drawn as jurors for such trial." (2 *R. S.* 734, § 9.) This preliminary trial was not a "trial for any offence" whatever, and there was no error in refusing to allow peremptory challenges to be made.

Challenges for cause are allowable on the trial of preliminary as well as final issues. This was conceded, and several of this description were interposed on behalf of the prisoner. I pass by these without particular examination, as this class of challenges will again be presented for consideration before the case is closed, when such suggestions will be made as are deemed pertinent to this, as well as other parts of the case.

An objection was made to the oath as administered to some of the triers of challenges to jurors drawn for this preliminary trial. The oath was thus: "You do solemnly swear that you will well and truly try and well and truly find, whether the juror is indifferent between the people of the state of New-York and the prisoner at the bar, upon the issue joined." This form of oath was not administered in every instance, the qualification at its close, made by the words "*upon the issue joined,*" being sometimes omitted, as it should have been throughout. The oath, as given in books of approved credit and authority, contains no such limitation, but requires the triers to find whether the juror is or is not indifferent between the parties to the controversy. (*Tr. per Pais,* 205; 1 *Ch. C. L.* 549; *Bac. Ab. Juries,* E. 12, *note;* 1 *Cowen,* 441, *note;* 1 *Salk.* 152.) And

Freeman *v.* The People.

jurors should be so. It is not enough that they are indifferent upon the particular issue to be tried. An actual and thorough impartiality in regard to the parties, is required; for no one who labors under prejudice, malice or ill will towards another can be in a fit frame of mind to act impartially where his rights are in question. In *Brittain* v. *Allen,* (2 *Dev.* 120,) the defendant challenged a juror for cause, to wit, hostility between the juror and the party challenging. The challenge was overruled and the juror was sworn. On a motion for a new trial, *Henderson, C. J.* said: "It seems that the judge disregarded all kinds of hostility but that which related to the *particular suit then to be tried.* I think that the law is otherwise. The juror should be perfectly impartial and indifferent; causes apparently very slight, are good causes of challenge, and that which is good cause for quashing the array, is good cause of challenge to the polls. I mention this, as most, at least many of the cases are challenges to the array. If the sheriff be liable to the distress of either party, or if he be his servant or counsellor, or if he has been god-father to a child of either of the parties, or either of them to his; or if an action which implies malice, as assault and battery, slander or the like, is depending between them, these all are causes of principal challenge. (*Bac.Ab. Juries, E.* 1.) From these cases, particularly the one which states a suit pending which implies malice, it appears that general hostility, by which I mean that which is not confined to the particular suit, is cause of challenge. From these causes, the law of itself implies a want of indifference, which the defendant offered to show. I think he ought to have been permitted to do so, and if he succeeded, that the juror should not have been sworn. For this cause, and for this only, there should be a new trial." So in the case at bar, the oath only required the triers to find indifference between the parties "upon the issue" then to be decided. In other respects, if the clause is susceptible of any meaning, the juror, although a sworn enemy of the prisoner, might still be found by the triers to be a competent and proper person to pass upon the question then to be decided. This would be intolerable, and an oath which requires, or

will admit of such a construction, cannot be correct. There is no precedent for one in this form, as will be seen on looking at the authorities already referred to. At the very best, the clause objected to is unmeaning or ambiguous. But an oath should be plain, explicit and free from all ambiguity. If this clause does not necessarily affix an improper limitation to the obligation which the law seeks to cast upon the trier by the oath administered to him, it is very liable so to be construed and understood as to have that effect.

In charging the jury on the preliminary issue, which, we have seen was on the fact of present insanity, the court said, "the main question with the jury was to decide whether the prisoner knew right from wrong ; if he did, then he was to be considered sane."

The statute, before cited, is emphatic that "no insane person can be tried." . In its terms the prohibition is broad enough to reach every possible state of insanity, so that, if the words are to be taken literally, no person while laboring under insanity in any form, however partial and limited it may be, can be put upon his trial. But this the legislature could not have intended; for, although a person totally bereft of reason cannot be a fit subject for trial or punishment, it by no means follows that one whose insanity is limited to some particular object or conceit, his mind in other respects being free from disease, can justly claim the like exemption. This clause of the statute should receive a reasonable interpretation, avoiding on the one hand what would tend to give impunity to crime, and on the other seeking to attain the humane object of the legislature in its enactment. The common law, equally with this statute, forbids the trial of any person in a state of insanity. This is clearly shown by authorities which have been referred to, and which also show the reason for the rule, to wit, the incapacity of one who is insane to make a rational defence. The statute is in affirmance of this common law principle, and the reason on which the rule rests furnishes a key to what must have been the intention of the legislature. If, therefore, a person arraigned for a crime, is capable of understanding the

nature and object of the proceedings going on against him ; if he rightly comprehends his own condition in reference to such proceedings, and can conduct his defence in a rational manner he is, for the purpose of being tried, to be deemed sane, although on some other subjects his mind may be deranged or unsound. This, as it seems to me, is the true meaning of the statute; and such is the construction put by the English courts, on a similar clause in an act of parliament.

By the 39 and 40 *Geo.* 3, *ch.* 94, § 2, it is enacted that " if any person indicted for any offence shall be insane, and shall upon arraignment be found so to be by a jury lawfully impannelled for that purpose, so that such person cannot be tried upon such indictment," " it shall be lawful for the court before whom any such person shall be brought to be arraigned," " to direct such finding to be recorded, and thereupon to order such person to be kept in strict custody till his majesty's pleasure shall be known." (1*Russ. on C.* 15.) The question upon this statute is the same as upon ours, that is, is the alleged offender insane. Russell says (*p.* 15,) " If a prisoner have not at the time of the trial, from the defect of his faculties, sufficient intelligence to understand the nature of the proceedings against him, the jury ought to find that he is not sane, and upon such finding he may be ordered *to be kept in custody under this act.*" For this he refers to the case of *Rex.* v. *Dyson,* (7 *C. & P.* 305, *same case* 1 *Lewin's C. C.* 64,) before Mr. Justice *J. Parke,* in 1831. In that case the prisoner was indicted for murder, and on being arraigned stood mute. A jury was then impannelled to try whether she did so by malice or by the visitation of God, and they found she did so by the visitation of God. The judge thereupon examined on oath, a witness who was acquainted with the prisoner, and who swore that she could be made to understand some things by signs, and could give her answers by signs. The witness was then sworn to interpret and make known to the prisoner the indictment and charge against her, and to the court her plea and answer thereto. The witness explained to her by signs what she was charged with, and she made signs which imported a denial of the charge ; whereupon

the judge directed a plea of not guilty to be recorded. The witness, by direction of the court, then stated to her that she was to be tried by a jury, and that she might object to such as she pleased; but he testified that it was impossible to make her comprehend a matter of that nature, although she might understand subjects of daily occurrence which she had been in the habit of seeing. A jury was thereupon "impannelled and sworn to try whether she was sane or not," and proof was given of "her incapacity at that time to understand the mode of her trial, or to conduct her defence." The judge "told the jury, that if they were satisfied that the prisoner had not then, from the defect of her faculties, intelligence enough to understand the nature of the proceedings against her, they ought to find her not sane." The jury so found, and the prisoner was detained in close custody as the statute directs. A similar case occurred in 1836, which was disposed of in the same way. *Alderson, B.* said to the jury, "the question is whether the prisoner has sufficient understanding to comprehend the nature of this trial, so as to make a proper defence to the charge." (*Rex* v. *Pritchard, 7 C. & P.* 303.) Both these prisoners had been at all times deaf and dumb. In presumption of law such persons are always idiots or madmen, although it may be shown that they have the use of understanding and are capable of committing crimes, for which, in that event, they should be punished. (1 *Russ. on Crimes,* 6 ; *Shelf. on Lunacy,* 3.)

In the case of *The Queen* v. *Goode,* (7 *A. & E.* 536,) which occurred in 1837, the prisoner was brought into the court of queen's bench and arraigned on an indictment for a misdemeanor. As he showed clear symptoms of insanity, a jury was immediately impannelled to try whether he was then insane or not; and upon evidence given, as well as upon his appearance in court, the jury found that he was insane. The prisoner was thereupon detained in custody under the statute.

In *Ley's case,* (1 *Lewin's C. C.* 239,) on the trial of a similar question, *Hullock, B.* said to the jury. "If there be a doubt as to the prisoner's sanity, and the surgeon says that it is doubtful, you cannot say that he is in a fit state to be put upon his trial."

The course at common law was much the same. In *Frith's case*, (22 *How. State Tr.* 307, 318,) which preceded the act of 39 and 40 *Geo.* 3, to which reference has been made, the prisoner was arraigned for high treason, and a jury sworn to inquire whether he was of sound mind and understanding or not. Lord *Kenyon*, chief justice of the court of king's bench, presided at the trial, assisted by one of the judges of the court of common pleas and one of the barons of the court of exchequer. It was observed by the court to the jury that the inquiry was not whether the prisoner was insane when the alleged crime was committed, nor was it necessary to inquire at all, what effect his present state of mind might have when that question came to be discussed ; but the humanity of the law of England had prescribed that no man should be called upon to make his defence, at a time when his mind was in such a situation that he appeared incapable of doing so : that however guilty he might be, the trial must be postponed to a time when, by collecting together his intellects, and having them entire, he should be able so to model his defence, if he had one, as to ward off the punishment of the law ; and it was for the jury to determine whether the prisoner was then in that state of mind. (*Shelf.* 468.)

With these lights before us, the construction of the statute, which forbids the trial of any insane person, cannot be attended with much difficulty. A state of general insanity, the mental powers being wholly perverted or obliterated, would, necessarily, preclude a trial ; for a being in that deplorable condition can make no defence whatever. Not so, however, where the disease is partial, and confined to some subject, other than the imputed crime and the contemplated trial. A person in this condition may be fully competent to understand his situation in respect to the alleged offence, and to conduct his defence with discretion and reason. Of this the jury must judge ; and they should be instructed that if such is found to be his condition, it will be their duty to pronounce him sane. In the case at bar the court professed to furnish a single criterion of sanity, that is, a capacity to distinguish between right and wrong. This, as a test

of insanity, is by no means invariably correct ; for while a person has a very just perception of the moral qualities of most actions, he may, at the same time, as to some one, in particular, be absolutely insane, and, consequently, as to this, be incapable of judging accurately between right and wrong. If the delusion extends to the alleged crime, or the contemplated trial, the party manifestly, is not in a fit condition to make his defence, however sound his mind may in other respects be. Still, the insanity of such a person being only partial, not general, a jury, under a charge like that given in this case, might find the prisoner sane; for in most respects he would be capable of distinguishing between right and wrong. Had the instruction been that the prisoner was to be deemed sane, if he had a knowledge of right and wrong in respect to the crime with which he stood charged, there would have been but little fear that the jury could be misled ; for a person, who justly apprehends the nature of a charge made against him, can hardly be supposed incapable of defending himself in regard to it in a rational way. At the same time it would be well to impress distinctly on the minds of jurors, that they are to gauge the mental capacity of the prisoner, in order to determine whether he is so far sane as to be competent in mind to make his defence, if he has one ; for, unless his faculties are equal to that task, he is not in a fit condition to be put on his trial. For the purpose of such a question, the law regards a person thus disabled by disease, as *non compos mentis*, and he should be pronounced unhesitatingly, to be insane within the true intent and meaning of this statute.

Where insanity is interposed as a defence to an indictment for an alleged crime, the inquiry is always brought down to the single question of a capacity to distinguish between right and wrong at the time when the act was done. In such cases the jury should be instructed that " it must be clearly proved that, at the time of committing the act, the party accused was laboring under such a defect of reason from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong. The mode of putting the latter part of the

question to the jury on these occasions has generally been, whether the accused, at the time of doing the act, knew the difference between right and wrong: which mode, though rarely, if ever, leading to any mistake with the jury, is not deemed so accurate when put generally and in the abstract, as when put with reference to the party's knowledge of right and wrong in respect to the very act with which he is charged." (2 *Greenl. Ev.* § 373.) This is the rule laid down by all the English judges but one, in the late case of *McNaghten*, while pending in the house of lords. The case is reported in 10 *Clark & Fin.* 210, and the opinion of the judges may be found in a note to the section of Greenleaf's Evidence referred to. In *Reg.* v. *Oxford*, (9 *C. & P.* 525,) Lord Denman, C. J., charged the jury in this manner: " The question is, whether the prisoner was laboring under that species of insanity which satisfies you that he was quite unaware of the nature, character and consequences of the act he was committing, or, in other words, whether he was under the influence of a diseased mind, and was really unconscious, at the time he was committing the act, that it was a crime." The insanity must be such as to deprive the party charged with crime, of the use of reason in regard to the act done. He may be deranged on other subjects, but if capable of distinguishing between right and wrong in the particular act done by him, he is justly liable to be punished as a criminal.

Such is the undoubted rule of the common law on this subject. Partial insanity is not, by that law, necessarily an excuse for crime, and can only be so where it deprives the party of his reason in regard to the act charged to be criminal. Nor, in my judgment, was the statute on this subject intended to abrogate or qualify the common law rule. The words of the statute are, "No act done by a person in a state of insanity can be punished as an offence." (2 *R. S.* 697, § 2.) The clause is very comprehensive in its terms, and, at first blush, might seem to exempt from punishment every act done by a person who is insane *upon any subject whatever*. This would, indeed, be a mighty change in the law, as it would afford absolute impunity

to every person in an insane state, although his disease might be confined to a single and isolated subject. If this is the meaning of the statute, jurors are no longer to inquire whether the party was insane "in respect to the very act with which he is charged," but whether he was insane in regard to any act or subject whatever; and if they find such to have been his condition, render a verdict of not guilty. But the statute is not so understood by me. I interpret it as I should have done if the words had been "no act done by a person in a state of insanity, *in respect to such act,* can be punished as an offence." The act, in my judgment, must be an *insane act,* and not merely the act of an *insane person.* . This was plainly the rule of law before the statute was passed, and, although that took place more than sixteen years since, I am not aware that it has, at any time, been held or intimated by any judicial tribunal, that the statute had abrogated, or in any respect modified this principle of the common law.

But to return to the trial of the preliminary question in the present case. The jury found, not as the issue required them to do, that the prisoner was or was not insane, but that he was "*sufficiently* sane in mind and memory to distinguish between right and wrong." This verdict was defective: it did not directly find any thing, and certainly not the point in issue, but evaded it by an argumentative finding. At the utmost the jury only made an approach towards the point to be decided, but failed to reach it. They should have been required to pass directly on the question of insanity, and should not have been allowed to evade it by an argumentative verdict of any sort. Such a finding as this would be objectionable in a civil proceeding, and in a criminal case should not be allowed. (*In the matter of Morgan, a lunatic,* 7 *Paige,* 236.)

The preliminary trial being closed, a plea of not guilty was entered for the prisoner, and the court proceeded to the trial of the main issue. Numerous objections were taken in the course of the trial by the counsel for the prisoner, most of which were obviously not well founded, and were properly overruled by the court. I shall notice but few of the points excepted to, as it is

deemed unnecessary to give to each of them a separate examination.

Several persons drawn as jurors were, in the first place, challenged for principal cause by the counsel for the prisoner; but the court held that these challenges were not sustained by the evidence adduced in their support. Challenges for favor were then interposed; but the jurors were found by the triers to be indifferent. Various exceptions were taken by the prisoner's counsel to points made and decided in disposing of these challenges; and, although the several jurors thus challenged were ultimately excluded by the peremptory challenges of the prisoner, it is now urged that these exceptions are still open to examination and review in this court. I think otherwise. The prisoner had the power and the right to use his peremptory challenges as he pleased, and the court cannot judicially know for what cause or with what design he resorted to them. (*The People* v. *Bodine,* 1 *Denio,* 310.) He was free to use or not use them, as he thought proper; but having resorted to them they must be followed out to all their legitimate consequences. Had he omitted to make peremptory challenges, his exceptions growing out of the various challenges for cause, would have been regularly here for revision. But he chose by his own voluntary act to exclude these jurors, and thus virtually, and as I think, effectually blotted out all such errors, if any, as had previously occurred in regard to them. But the case of the juror Beach, stands on other grounds. He was first challenged, as is said, for principal cause, which, after evidence had been given, was overruled by the court. He was then challenged for favor, but the triers found him to be indifferent. No peremptory challenge was made, and he served as one of the jury. As to this juror, every exception taken by the prisoner's counsel is now here for examination and review.

When a juror is challenged for principal cause, or for favor, the ground of the challenge should be distinctly stated; for without this the challenge is incomplete and may be wholly disregarded by the court. It is not enough to say I challenge for principal cause or for favor, and stop there; the cause

of the challenge must be specified. In *Mann* v. *Glover*, (2 *Green's R.* 195,) the court say: "A party cannot make a principal challenge, or a challenge to the favor, by giving it a name. A challenge, whether in writing or by parol, must be in such terms that the court can see, in the first place, whether it is for principal cause or to the favor; and so determine by what forum it is to be tried; and secondly, whether the facts, if true, are sufficient to support such challenge." Again, the challenger must "state why the juror does not stand indifferent; he must state some facts or circumstances which, if true, will show either that the juror is positively and legally disqualfied, or create a probability or suspicion that he is not or may not be impartial. In the former case the challenge would be a principal one, triable by the court; in the latter, it would be to the favor, and submitted to triers."

These views are sound and appropriate, and their observance would greatly promote order and convenience in the determination of challenges. I am aware that challenges are not unfrequently made in general terms, which merely indicate the supposed character of the challenge, as for principal cause or for favor, but without designating the particular grounds by which, if at all, they must be sustained. In this posture of the question, as far as a question can be said to have been made, the parties proceed to the examination of witnesses before the court or triers, as the case may be. No issue has been joined, and no matter of fact alleged by either party. What is to be tried? It can hardly be determined in such a state of things whether the question is one of fact or of law, and the proceeding is obviously inconvenient and irregular. Challenges for principal cause may become part and parcel of the record, and should therefore be made in due form. They may be demurred to, and unless some cause, sufficient of itself to raise the legal presumption of unindifference is alleged, the challenge must of course be overruled. But the opposite party is not bound to demur; he may take issue on the facts stated as ground for the challenge, or may counterplead new matter in avoidance. Thus an issue of fact may be joined, which must

be decided upon the evidence to be adduced by the respective parties. By pursuing the orderly mode of requiring the challenger to specify the grounds of his challenge, and the opposite party to demur, take issue or counterplead, questions of law and fact will be kept distinct, and, as I apprehend, the convenience of the parties as well as that of the court will be greatly promoted.

The case of *Mann* v. *Glover*, has not been referred to as containing any new doctrine, but because it presents a terse summary of the law on this subject. All challenges, except such as may be made peremptorily, are *for cause ;* and unless some cause is stated by the challenger, the objection cannot justly be called a challenge, nor should it be regarded as such.

The bill of exceptions does not show, in terms, what cause of challenge was alleged against the juror Beach ; it is only said he was challenged " for principal cause." But from the scope and character of the evidence given to maintain the challenge, the inference is plain that it was alleged the juror had formed and expressed an opinion that the prisoner was guilty of the crime for which he stood indicted. This was good cause of principal challenge, as has repeatedly been held by this court. (*Ex parte Vermilyea*, 6 *Cowen*, 555 ; 7 *id.* 108 ; *The People* v. *Mather*, 4 *Wend.* 229. *See also Mann* v. *Glover, supra ; The State* v. *Benton*, 2 *Dev. & B.* 196 ; *Irvine* v. *Kean*, 14 *S. & R.* 292 ; *The Commonwealth* v. *Lesher*, 17 *id.* 155.) We must then understand this cause of challenge to have been alleged, and as evidence was gone into, the fact must have been expressly or virtually denied by the public prosecutor. An issue was thus joined to be tried by the court, and if the fact alleged was found to be true, the juror was necessarily excluded. Every challenge for principal cause, must be for some matter which imports absolute bias or favor, and leaves nothing for the discretion of the court. The truth of the fact alleged, and that alone, is in question. Its sufficiency, as ground of challenge, is conceded by omitting to demur and taking issue on the fact. It is otherwise, on a challenge for favor. That must be determined by triers, who are to pass upon the question of ac-

tual bias or favor. They are final judges upon the matters submitted to them; and from their decision, when properly instructed, the law has provided no appeal.

The challenge of the juror Beach, for principal cause, was not, in my opinion, sustained by the evidence, and was correctly overruled. He had only an impression that the prisoner was guilty, but nothing which deserved to be called an absolute opinion. He had doubts of the prisoner's guilt, and as far as any opinion had been formed, it was contingent and hypothetical. Such impressions or opinion fall short of what is required to maintain a challenge for principal cause. (*The People* v. *Bodine,* 1 *Denio,* 281, 306; *The People* v. *Mather,* 4 *Wend.* 243, *and cases there cited; Mann* v. *Glover, supra*; *Irvine* v. *Lumbermen's Bank,* 2 *W. & S.* 190, 202.) (*a*)

The challenge for principal cause having been overruled, or in other words, found not to be sustained by the evidence given in its support, this juror was challenged for favor, and the question of his indifference was submitted to triers on the same evidence which had been given to the court on the trial of the challenge for principal cause. As the bill of exceptions states, the court charged the triers the same as in the case of the juror Taylor, to which charge and every part and portion thereof the counsel for the prisoner excepted.

In the case of the juror Taylor, evidence was given, tending to show that he had decided impressions against the prisoner, and a pretty strong belief of his guilt; and in the case of Beach, the evidence, although less decisive, was of the same character. The court charged the triers, in the case of the juror Taylor, amongst other things, that the resort to the triers by the prisoner's counsel, was in the nature of an appeal from the opinion of the court on the facts, and that a hypothetical opinion formed by the juror did not disqualify him, These points were distinctly stated in the charge, and, as it seems to me, are plainly reached by the exceptions as taken. The charge embraced several distinct propositions, amongst which were those

---

(*a*) See also *The People* v. *Honeyman,* (3 *Denio,* 121.)

Freeman *v.* The People.

I have stated ; and although a separate and formal exception was not pointed at each of these positions as laid down by the court, the exception, as taken, was, in my opinion, fully sufficient to apprize the court and the counsel of what was intended. In terms, the exception extended to " every part" and " portion" of the charge, which would seem to be sufficient to reach every distinct position of the law which had been laid down by the court. At all events, in a capital case, where it is obvious that the court regarded the exception, as stated, fully sufficient for the occasion, I do not feel at liberty to overlook it as deficient in the requisite degree of certainty.

Then, as to the legal positions laid down by the court, and which have already been stated, it seems to me they cannot be maintained. I would not be understood to hold that a hypothetical opinion, necessarily disqualifies a juror. It clearly does not. If such was its effect it would uphold a challenge for principal cause, which it will not. Still, it is some evidence of bias, and upon which triers, in their discretion, may set a juror aside. (*The People* v. *Bodine, supra.*) The court should not instruct them, as matter of law, as was done in this case, that such an opinion does not disqualify a juror ; for this, in effect, is charging them that he cannot be set aside on that ground. If the triers find that bias actually exists in the mind of the juror, although it is proved only by the formation of a hypothetical opinion, they may, and ought to, reject him. Some minds are so constituted that such an opinion would exert a controlling influence in the jury box, while with others its influence would be neither seen or felt. All this is to be considered and passed upon by the triers. No rule can be laid down which will enable them, in every case, to determine, with unerring certainty, that the juror is or is not indifferent between the parties. It is not a question to be solved by a rule of law, but by the common sense of the triers ; and if this has fair play the difficulty will rarely be found very great. The triers must find that the juror stands impartial and indifferent, or they should reject him. It is the province of the court to say what evidence is admissible on the question of indifference ; but its strength and influence

in establishing the allegation of favor or bias, are for the trie s alone to determine. The court erred in instructing these triers that the juror could not be found unindifferent on evidence that he had formed a hypothetical opinion of the guilt of the prisoner. The instruction should have been that this was evidence to be considered by the triers, and if it convinced them that actual bias existed, the juror ought to be excluded; but if his mind was, notwithstanding, found to be impartial and unbiassed, the objection should be disregarded.

I know of no sense in which a resort to triers by a challenge for favor, can be rightly regarded as an appeal from the decision of the court on a challenge for principal cause. The latter species of challenge is allowed on some ground from which the law infers partiality or bias; and where the fact is put in issue the court has only to find whether it is true or not. If true, the law adjudges unindifference, and the juror is necessarily excluded. The court is not to pass upon the question of actual bias, but simply to ascertain the truth of the alleged cause of challenge; for if that is true, it follows that the juror is unindifferent.

But on a challenge for favor no such isolated question is presented to the triers. They are first to inquire whether the alleged cause or ground of challenge is true in fact. But this is not all, for supposing its truth to be established, they must then pass upon the effect it has produced on the mind of the juror, and find whether the consequence has been actual bias or favor. The triers must come to this conclusion before they can exclude a juror on a challenge for favor. But as no such question is to be decided by the court on a challenge for principal cause, the charge, in this case, that the resort to the triers was an appeal from the decision of the court, was erroneous. Besides, the tendency of such a charge must be to prejudice the prisoner on the question to be decided by the triers, for it virtually places them in the position of persons sitting in judgment on what had immediately before been determined by the court. It should never be lost sight of that triers are to ascertain the real state of the mind of the juror, to determine whether he is truly impartial and indifferent between the par-

ties—without favor or bias as to either; and that all the evidence given is only allowable as material to enable the triers to come to this result. On this part of the case, my opinion is, that there was error in the instructions to the triers, and for which the judgment should be reversed and a new trial ordered.

I proceed to another class of questions made by the prisoner's counsel.

The verdict on the preliminary issue was rendered on the 6th of July. In the course of the trial, and shortly after the 15th of that month, several medical witnesses were sworn and examined on the part of the prisoner, with a view to establish his insanity the preceding March, when the alleged murder was perpetrated. One of these witnesses, Doctor Van Epps, had known the prisoner from his childhood, and had visited and examined him with a view to ascertain his mental condition, both before and after the 6th of July. The others had never seen the prisoner until the 15th of July; but they also had examined him, on and after that day, in order to be prepared to express an opinion on the question of his sanity or insanity.

That part of the bill of exceptions which states the questions made and exceptions taken, in regard to these witnesses, is, perhaps, liable to some misapprehension, and it may be that I have not rightly understood what was intended to be decided by the court. I have read this part of the bill of exceptions repeatedly, with an anxious desire to collect its true meaning; and although I would not affirm positively, that its meaning may not have been misapprehended, I still think no error has been fallen into in regard to the views of the court. As I understand the bill of exceptions, the court held that it was competent for these, or other medical witnesses, to express an opinion upon the question of the insanity of the prisoner at the time of the alleged murder, but that such opinion must be formed upon facts and circumstances which occurred, or observations made, before the 6th of July, when the verdict on the preliminary issue was rendered, and could, in no degree, rest upon any thing observed in the appearance, manner or condition of the prisoner since that time; and that the witnesses

could not, with a view to fortify the conclusion of insanity at the time of the homicide, be allowed to express an opinion that he was insane at the trial, or had been at any time since the 6th of July. Nor was it even allowable to say they had examined the prisoner, since that time, with a view to ascertain his mental condition. These restrictions were deemed proper by the court, as I gather from the bill of exceptions, on the ground that the verdict, on the preliminary issue, had conclusively established, for all purposes connected with this trial, the sanity of the prisoner at the time when that verdict was rendered.

I cannot adopt the suggestion, made on the argument, that the 6th of July may have been taken as a reasonable time by which to bound the inquiries made of these witnesses: on the contrary, I think it quite clear that the court regarded the pre liminary verdict as decisive of the question of present insanity, and therefore limited the witnesses to the time when that verdict was rendered. In giving reasons for his opinion that the prisoner was insane, Doctor Van Epps spoke of an interview with him since the 6th of July, when he "was stopped by the court, who then remarked, (an objection having been made by the counsel for the people,) that the question of present sanity had been tried and a verdict rendered on the 6th of July instant, and that the question of the present sanity could not then be again retried ;" that the question now was as to the sanity of the prisoner when the deed was done, the preceding March, "and that the evidence of insanity must be confined to facts before and at the time of committing the act, and up to the 6th of July instant, when the verdict of sanity was rendered." Doctor Hun, another of these witnesses, had first seen the prisoner on the fifteenth of July. The prisoner's counsel "proposed to prove by this witness that, in his opinion, the prisoner is and was insane at the time of the commission of the crime. This was objected to by the counsel for the people, on the ground that the verdict on the preliminary issue, rendered on the sixth day of July instant, was and is conclusive that the prisoner was sane on that day; and that the same cannot be contradicted by evidence." The court did not pass directly upon this

offer and objection; although the ground stated by the counsel for the people is understood to have been precisely that which the court acted upon. This witness was asked if he had made a personal examination of the prisoner, since his arrival at the court, which was on the 15th of July, "with reference to the state of his mind." To this the counsel for the people objected, and the court refused to allow the witness to give an answer. He was then asked if it was his opinion, founded upon personal examination since the sixth of July, that the prisoner was insane on the twelfth of March, when the homicide was perpetrated. This was objected to by the counsel for the people, and the court sustained the objection. The witness was then asked his opinion, founded on such examination, as to the prisoner being insane at the time when the question was put. This was also objected to and excluded by the court. Doctor McNaughton was examined under like restrictions. "The court decided that the witness should not testify as to any examination made by him of the prisoner since the sixth day of July instant," and particularly "instructed the witness that he should, in any future testimony to be given by him upon the trial of this cause, exclude all knowledge or information gained by him of or about the prisoner by or from any personal examination made by him of said prisoner, since the said sixth day of July instant." These references to points decided and views expressed by the court, clearly show, in my opinion, that the court regarded the preliminary verdict as absolutely conclusive for all purposes, in this case, that the prisoner on and after the sixth of July, was in a sane state.

The views of the court upon this part of the case were, in my opinion, clearly erroneous. In strictness the verdict on the preliminary issue was not before the court and jury on the trial of the issue of guilty or not guilty, nor was it, in any respect, material to such trial. But if it should be regarded as a fact in the case, of which the court and jury, while engaged in the trial of the main issue, might take notice, no such consequence as that deduced by the court would follow from it. The only object of the preliminary trial was to ascertain the mental con-

dition of the prisoner, in order to determine whether he should then be tried on the indictment. This, I repeat, was the only object of that trial, and the result at which the first jury arrived could have no possible bearing or just influence upon the trial of the main issue. The indictment was not to be tried piecemeal, but at one time, and by a single jury. If, therefore, the opinion sought to be obtained from these medical witnesses, was otherwise competent and proper, and that seems to have been conceded, it is perfectly clear that the preliminary verdict constituted no obstacle to its reception.

I am not about to inquire how far, or under what circumstances, the opinion of medical witnesses may be admissible on the question of insanity, although, in general, nothing is better settled than that such evidence is competent. (1 *Phil. Ev.* 290; *Shelford on Lun.* 62, 67—73; 1 *Greenf. Ev.* § 440.) And I entertain no doubt that such a witness should be allowed to express an opinion in regard to the mental condition of a person alleged to be insane in the month of March, although the opinion may have been founded solely on an examination made in the succeeding July. In most cases, undoubtedly, the opinion would be more satisfactory and convincing, when based on observations made at or about the time to which the inquiry relates. But this is not decisive against the reception of such evidence, though founded on examinations made at a later period. The competency of the testimony is one question, and its effect another. The first is for the court and the latter for the jury. It will sometimes, undoubtedly, be found, and perhaps not unfrequently, that the mental malady is such that an examination would disclose beyond all peradventure to a skilful physician, what must have been the condition of the patient for months or years before. The lateness of the time when the examination was made, as well as the character of the malady, are certainly to be considered in determining the degree of consequence which should be given to the opinion of the witness, but unless the intervening time is much greater than from March to July, that can furnish no solid objection to the admissibility of the evidence. If I could, therefore, adopt

the suggestion that the sixth of July was taken by the court as a reasonable limitation to inquiries of this description, I should still be unable to agree that the court had a right to impose any such restriction upon the witnesses. It was competent for such witnesses to state what their opinions were, whether founded on examinations before or during the trial; and these opinions might not only extend to the mental condition of the prisoner at the time when the homicide was perpetrated, but they might be brought down to the very time when the witness was speaking. The latter would be admissible, not because the present insanity of the prisoner would necessarily control the verdict, but because it tended to fortify the conclusion that insanity existed in the preceding March. But, although such are my views upon this part of the case, it is not supposed that the court excluded the evidence of the opinion of these witnesses in consequence of the lateness of the period when their examinations had been made. The evidence was shut out, as I understand the case, because the verdict on the preliminary issue was supposed to constitute an insuperable bar to its reception. This, as before said, was in my judgment erroneous. Upon the whole case, therefore, I think the judgment of the court below should be reversed, and a new trial ordered.

Whether the prisoner was or was not insane at the time of the homicide or the trial, is not a question before us on this bill of exceptions, and no opinion on that subject is intended to be expressed or intimated.

. Judgment reversed.