# Case No. 16,287a.

## UNITED STATES v. SICKLES.

[2 Hayw. & H. 319.][1]

Criminal Court, District of Columbia. April 20, 1859.

MURDER—PRESUMPTION OF MALICE—INSANITY AS DEFENSE—PROVINCE OF JURY—REASONABLE DOUBT OF SANITY.

1. The burden of rebutting the presumption of malice by showing circumstances of allevi-

[1] [Reported by John A. Hayward, Esq., and George C. Hazleton, Esq.]

ation, excuse, or justification rests on the prisoner, and it is incumbent on him to make out such circumstances to the satisfaction of the jury, unless they arise out of the evidence produced against him.

2. The law does not require that the insanity which absolves from the crime should exist for any definite period, but only that it exists at the moment when the act occurred with which the accused stands charged. The time when the insanity is to operate is the moment when the crime charged upon the party was committed, if committed at all.

3. Every one is presumed to be sane who is charged with a crime, but when evidence is adduced that a prisoner is insane, conflicting testimony makes it a question for the jury, and raises a reasonable doubt which should avail a prisoner on a defence of insanity as to any other matter of fact.

The following indictment was read to the jury by Mr. Ould: "District of Columbia, County of Washington, to wit: The jurors of the United States, for the county aforesaid, upon their oaths, do present that Daniel E. Sickles, late of the county of Washington aforesaid, gentleman, not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil, on the 27th day of February, A. D. 1859, with force and arms, at the county aforesaid, in and upon the body of one Philip Barton Key, in the peace of God and of the United States, then and there being feloniously and willfully, and of his malicious aforethought, did make an assault; and that the said Daniel E. Sickles, a certain pistol of the value of two dollars, then and there charged with gunpowder and one leaden bullet, which said pistol he, the said Daniel E. Sickles, in his right hand then and there had and held, then and there feloniously, willfully and of his malice aforethought, did discharge and shoot off, to, against and upon the said Philip Barton Key; and that the said Daniel E. Sickles, with the leaden bullet aforesaid, out of the pistol aforesaid, then and there, by force of the gunpowder aforesaid, by the said Daniel E. Sickles, discharged and shot off as aforesaid, then and there feloniously, willfully and of his malice aforethought, did strike and penetrate and wound him, the said Philip Barton Key, in and upon the left side of him, the said Philip Barton Key, a little below the tenth rib of him, the said Philip Barton Key, giving to him, the said Philip Barton Key, then and there, with the leaden bullet aforesaid, so as aforesaid discharged and shot out of the said pistol as aforesaid by the said Daniel E. Sickles, in and upon the left side of him, the said Philip Barton Key, a little below the tenth rib of him, the said Philip Barton Key, one mortal wound of the depth of ten inches and of the breadth of half an inch; of which said mortal wound he, the said Philip Barton Key, then and there instantly died. And so the jurors aforesaid, upon their oaths aforesaid, do say that the said Daniel E. Sickles, him, the said Philip Barton Key, in manner and form and by the means aforesaid, then and there feloniously, willfully and of his mal-

ice aforethought, did kill and murder, against the form of the statute in such case made and provided, and against the peace and government of the United States. Robert Ould, Attorney for United States."

The indictment having been read, the prosecution opened the case for the United States. After the opening by Mr. Ould, the judge stated that it had been the practice in this court for the defence to follow the prosecution in opening, prior to entering upon the testimony. If the defence, however, preferred to reserve their opening, they were entitled to do so.

Mr. Brady, for the defence, stated that they preferred to open to the jury after the evidence for the United States should be given.

The witnesses for the prosecution were then called by the clerk.

On the close of the testimony on the part of the prosecution the jury was addressed by John Graham, Esq., for the defence. On his completion the witnesses on the part of the defence were examined.

After the testimony on both sides was given, the prosecuting attorney, Mr. Carlisle, proceeded to read the instructions, which, as prepared by the district attorney and copied from the instructions given by the court in the Case of Day were: (1) If the jury believe from the evidence that the deceased was killed by the prisoner by means of a leaden bullet discharged from a pistol, such killing implies malice in law, and is murder. (2) That the burden of rebutting the presumption of malice by showing circumstances of alleviation, excuse or justification rests on the prisoner. (3) And it is incumbent on him to make out such circumstances to the satisfaction of the jury, unless they arise out of the evidence produced against him. (4) That every person is presumed to be of sound mind until the contrary is proved, and the burden of rebutting this presumption rests on the prisoner, with the addition of the following: (5) If the jury believe from the evidence that the deceased, previous to the day of his death, had adulterous intercourse with the wife of the prisoner, and further that the deceased on the day of his death, shortly before the prisoner left his house, made signals, inviting to a further act or acts of adultery, which said signals, or a portion of them, were seen by the prisoner; and that influenced by such provocation, the prisoner took the life of the deceased, such provocation does not justify the act or reduce such killing from murder to manslaughter.

Mr. Brady then proceeded to read the instructions asked by the defence: (1) There is no presumption of malice in this case, if any proof of "alleviation, excuse or justification" arises out of the evidence for the prosecution. State v. Johnson, 3 Jones [N. C.] 266; McDaniel v. State, 8 Smedes & M. 401; Day's Case [unreported]. (2) The existence of malice is not presumable in this case, if on any rational theory, consistent with all the evidence, the homicide was either justifiable or excusable, or an act of manslaughter. State v. Johnson, 3 Jones [N. C.] 266; McDaniel v. State, 8 Smedes & M. 401; U. S. v. Mingo [Case No. 15,781]; Com. v. York, 2 Benn. & H. Cr. Cas. 505. (3) If on the whole evidence presented by the prosecution there is any rational hypothesis, consistent with the conclusion that the homicide was justifiable or excusable, the defendant cannot be convicted. (4) If the jury believe that Mr. Sickles, when the homicide occurred, intended to kill Mr. Key, he cannot be convicted of manslaughter. (5) It is for the jury to determine, under all the circumstances of the case, whether the act charged upon Mr. Sickles is murder or justifiable homicide. People v. Ryan. 2 Wheeler, Cr. Cas. 47. (6) If the jury find that Mr. Sickles killed Mr. Key while the latter was in criminal intercourse with the wife of the former, Mr. Sickles cannot be convicted of either murder or manslaughter. (7) If from the whole evidence the jury believe that Mr. Sickles committed the act, but at the time of doing so was under the influence of a diseased mind, and was really unconscious that he was committing a crime, he is not in law guilty of murder. Day's Case [unreported]. (8) If the jury believe from any pre-disposed cause the prisoner's mind was impaired, and at the time of killing Mr. Key he became, or was mentally incapable of governing himself in reference to Mr. Key as the debauchee of his wife, and at the time of committing said act by reason of such cause, unconscious that he was committing a crime as to said Mr. Key, he is not guilty of any offence whatever. Day's Case [unreported]. (9) It is for the jury to say what was the state of the prisoner's mind as to the capacity to decide upon the criminality of the particular act in question—the homicide—at the moment it occurred, and what was the condition of the parties respectively, as to being armed or not at the same moment. These are open questions for the jury, as are any other questions which may arise upon the consideration of the evidence, the whole of which is to be taken into view by the jury. Jarboe's Case [unreported]. (10) The law does not require that the insanity, which absolves from crime, should exist for any definite period, but only that it exists at the moment when the act occurred with which the accused stands charged. (11) If the jury have any doubt as to the case, either in reference to the homicide or the question of sanity, Mr. Sickles should be acquitted.

Mr. Carlisle stated the grounds on what he thought the instructions asked by the prosecution should be granted; and those asked by the defence, or some of them, should be rejected.

After summing up of the case on the part of the defence by Mr. Stanton, Mr. Brady proceeded to argue the instruction on behalf of the defence.

Mr. Ould, the district attorney, made the

closing argument on the evidence, and the instructions prayed for by the prosecution and the defence.

Robert Ould, U. S. Dist. Atty., and J. M. Carlisle, for the United States.

James J. Brady, John Graham, E. N. Stanton, Ratcliffe, Clinton & Magruder, and Mr. Philips, for the prisoner.

CRAWFORD, J. (charging jury). The court is asked to give to the jury certain instructions, whether on the part of the United States or on the part of the defence. The first instruction asked for by the United States embodies the law of the case on the particular branch of it to which it relates, and is granted with some explanation as to insanity, with a reference to which the prayer closes. A great English judge has said on the trial of Oxford (who shot at the queen of England), 9 Car. & P. 525, "that if the prisoner was laboring under some controlling disease, which was in truth the acting power within him which he could not resist, then he will not be responsible." And again: "The question is whether he was laboring under that species of insanity which satisfies you that he was quite unaware of the nature, character and consequence of the act he was committing; or in other words, whether he was under the influence of a diseased mind and was really unconscious at the time he was committing the act that that was a crime. A man is not to be excused from responsibility if he has capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he is doing, a knowledge and consciousness that the act he is doing is wrong and criminal and will subject him to punishment. In order to be responsible he must have sufficient power of memory to recollect the relation to which he stands to others, and in which others stand to him; that the act he is doing is contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty. On the contrary, although he may be laboring under a partial insanity, if he still understands the nature and character of his act and its consequences; if he has knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know if he does the act he will do wrong and receive the punishment, such partial insanity is not sufficient to exempt him from responsibility for criminal acts." See Com. v. Rogers, 7 Metc. [Mass.] 500, 501, 503.

The second and third instructions asked for by the United States are granted.

The fourth instruction is answered by prayer eleven of the defence.

The fifth instruction asked for by the United States the court thinks is the law, and grants the instruction.

Now we come to those asked on the part of the defence, the first of which is in these words: "There is no presumption of malice in this case if any proof of alleviation, excuse or justification arise out of the evidence for the prosecution." There is, gentlemen, a legal presumption of malice in every deliberate killing, and the burden of repelling it is on the slayer, unless evidence of alleviation, mitigation, excuse or justification arise out of the evidence adduced against him. The alleviation, mitigation, excuse or justification must be such as the law prescribes, and within the limits already laid down in the instructions given to you.

In regard to the second instruction asked for by the defence, I would say: The answer to the first prayer will be taken in connection with my response to prayer number two: "If upon any course of reasoning consistent with all the evidence" and the law as laid down to you by the court, and the rules by which it is ascertained what is legal provocation, what is justification or excuse, you should come to the conclusion that there was such justification or excuse, or that the homicide was manslaughter, then the presumption of malice which the very killing of a human being involves, is met. You recollect that manslaughter is the killing of a man without malice.

The third prayer on the part of the defence is answered in the same manner as prayer number two.

The fourth prayer the court declines to grant; manslaughter may exist, and most frequently does, where the slayer intended to destroy life, but under circumstances which reduce the offence.

The fifth prayer cannot be granted, as to the jury belongs the decision of matters of fact, and to the court the decision of matters of law, which it is the duty of the jury to receive from the court; and from the evidence and the law applied to the facts it is the province and legal right of the jury to return a guilty or not guilty of murder or manslaughter.

In regard to the sixth instruction for the defence I would remark: If this prayer refers to actual (existing at the moment) adulterous intercourse with the wife of the prisoner, the slaying of the deceased would be manslaughter; and by existing adultery I do not mean that the prisoner stood by and witnessed the act of adultery progressing, for it is easy to suppose the actual fact to be established simultaneously with the killing by other evidence, in perfect consistence with the law; if, for instance, the husband saw the adulterer leave the bed of the wife, or shot him while trying to escape from the chamber. If, however, a day or half a day intervened between the conviction of the husband of the guilt of his wife and the deceased, and after the lapse of such time the husband take the life of the deceased, the law considers that it was done deliberately, and declares that it is murder.

The seventh and eighth instructions can be answered together. They are granted.

In reply to the ninth instruction the court responds thus: "It is for the jury to say what was the state of Mr. Sickle's mind as to his capacity to decide upon the criminality of the homicide, receiving the law as given to them in relation to the degree of insanity, whether it will, or not, excuse they (the jury) finding the fact of the existence or non-existence of such degree of insanity." The gist of this prayer is "what was the condition of the parties respectively as to being armed or not at the same moment"? So much of the instruction as I have now read I grant without qualification.

The tenth prayer reads thus: "The law does not require that the insanity, which absolves from crime should exist for any definite period, but only that it exists at the moment when the act occurred, with which the accused stands charged." That instruction is granted. The time when the insanity is to operate is the moment when the crime charged upon the party was committed, if committed at all.

The eleventh and last instruction asked reads this way: "If the jury have any doubt as to the case either in reference to the homicide or the question of insanity, Mr. Sickles should be acquitted." This instruction, as I mentioned in referring to prayer four of the United States will be answered in conjunction with it. It does not appear to be questioned that if a doubt is entertained by the jury, the prisoner is to have the benefit of it. As to the sanity or insanity of the prisoner at the moment when he committed the act charged, it is argued by the United States that every man being presumed to be sane, the presumption must be overcome by evidence satisfactory to the jury that he was insane when the deed was done. This is not the first time this inquiry has engaged my attention. The point was made and decided at the June term, 1858, in the case of U. S. v. Divilins [unreported], when the court gave the following opinion, which I read from my notes of the trial: "The prayer is based on the idea that the jury must be satisfied beyond all reasonable doubt of the insanity of the party for whom the defence is set up, precisely as the United States is bound to prove the guilt of a defendant to warrant a conviction. I am well aware, and it has appeared on this argument, that it has been held by a court of high rank and reputation, that there must be a preponderance of evidence in favor of the defence of insanity to overcome the presumption of law that every killing is murder; and that the same court has said that if there is an equilibrium, including, I suppose, the presumption mentioned of evidence, the presumption of the defendant's innocence makes the preponderance in his favor. Whether a man is insane or not is a matter of fact. What degree of insanity will relieve him from responsibility is a matter of law, the jury finding the fact of the degree too. Under the instructions of the court murder can be only committed by a sane man. Everybody is presumed to be sane who is charged with a crime, but when evidence is adduced that a prisoner is insane, and conflicting testimony makes a question for the jury, they are to decide it like any other matter of fact; and if they should say or conclude that there is uncertainty, that they cannot determine whether the defendant was or is not so insane, as to protect him, how can they render a verdict that a sane man perpetrated the crime and that no other can?"

Nor is this plain view of the question unsupported by authority. In the case of Reg. v. Ley, in 1828, Lewin, Crown Cas. 239, on a preliminary trial to ascertain whether a defendant was sufficiently sane to go before a petit jury on an indictment, Hullock, B., said to the jury: "If there be a doubt as to the prisoner's sanity, and the surgeon says it is doubtful, you cannot say he is in a fit state to be put on trial." This opinion was approved in Freeman v. People, 4 Denio, 9. This is a strong case, for the witness did not say the prisoner was insane, but only that it was doubtful whether it was so or not. The humane, and I will add, just doctrine, that a reasonable doubt should avail a prisoner, belongs to a defence of insanity, as much, in my opinion, as to any other matter of fact.

I believe, gentlemen, that that answers all the questions.

On the completion of the judge's charge the indictment was handed to the jury. The jury retired, and after an absence of a little over an hour they entered the court, and their finding as stated by their foreman was "not guilty," whereupon the court ordered the prisoner discharged from custody.