SUPREME COURT.  Albany General Term, December, 1859.  *Wright*, *Gould* and *Hogeboom*, Justices.

## MARY HARTUNG *v.* THE PEOPLE.

Evidence of a confession made by a party should not be excluded in a criminal case, on the sole ground that it was made while under arrest.  Such confession should be received, if it was voluntary, not made under the influence of fear or hope, or under an excitement or agitation of mind, which would probably affect its verity, nor drawn out by the act or conduct of the person to whom it was made.

There is no precise standard fixing the degree of knowledge which a witness must possess of a person's handwriting, to be allowed to express an opinion as to the authenticity of a particular paper.  If the witness has seen the party write, and acquired a knowledge, more or less perfect, of the character of the hand, he is allowed to express an opinion.

On the trial of an indictment for murder by poisoning, after an opinion, adverse to the theory of the prosecution, had been testified to by a physician, with reference to the appearances on a *post-mortem* examination, and the time indicated by them when the poison was introduced into the stomach, an experienced chemist, who had made the *post-mortem* examination, was asked by the prosecution the following question: "In your opinion can a physician, from a mere *post-mortem* examination of the exterior surface, and the indications of inflammation which he discovers, determine with any degree of certainty the precise period of time when such inflammation was caused?" and the question was objected to on the part of the prisoner, as being "immaterial, improper and incompetent;"

It was *held*,

That the question was competent;

That the objection raised no question as to the *form* of the interrogatory, but merely as to the substance;

And that the ground of the objection, as stated; presented no question whether an *opinion* was competent on the subject, nor whether the witness was one of the class of persons who were qualified to express an opinion, because such grounds of objection were not specifically stated:

Also *held*, that the subject matter of the question was one upon which a professional man or an expert might rightfully be called upon to express an opinion;

And that a chemist would be quite as competent to answer the question as a physician. (Justice Wright dissenting.)

The taking of exceptions is restricted to decisions made by the court below during the progress of the trial.  The decision of the Court of Oyer and Terminer, in refusing to grant a new trial, cannot be reviewed on exceptions.

A bill of exceptions should contain no more of the case than is necessary to present the questions of law raised on the trial, and which are the legitimate subjects of review on exception; and where other matters are inserted, they should be stricken out on motion.

MARY HARTUNG was convicted of the murder of her husband, Emil Hartung, at a Court of Oyer and Terminer, held before Mr. Justice Harris and his associates, in the city of Albany, in the month of February, 1859. William Reimann, her alleged paramour, was indicted with her as an accessory before the fact. The husband died on the 21st day of April, 1858, and, as claimed by the prosecution, from the effects of arsenical poison administered to him by his wife within two or three days previous to that event. On a post-mortem examination, arsenic was found in the stomach of the deceased. A few days subsequently, some suspicion having arisen against the prisoner, she left the city of Albany, where the parties had resided and the death occurred, and went with Reimann to New Jersey, and ultimately found employment at Guttenburg, in that State, in the family of Dr. Wetterbee, where she passed under the assumed name of Elizabeth Shultes. According to a statement by her to the sheriff, after her arrest, and while confined in the jail at Albany, she was instructed by Reimann to write to him under the address of Ferdinand Shultes. She did write a letter thus directed. It fell into the hands of a man in Albany of that name, and its contents led him to suspect that it had reference to the death of Hartung. It alluded to an *unfortunate disaster*, or calamity; was signed with the maiden name of the prisoner, Mary Theresa Koehler; contained a reference to the name of her mother, Louisa Leopold, and requested letters to be addressed to her under the name of Elizabeth Shultes. Shultes placed this letter in the hands of the sheriff, and it led to the arrest of the prisoner. She was found at the house of Dr. Wetterbee, in New Jersey. The letter was offered and received in evidence at the trial, some evidence having been given tending to show that it was in her handwriting. Exceptions were taken to the sufficiency of this proof, as also to the evidence of her statement or confession made to the sheriff, upon the ground that it was not voluntary. Dr. Rheinhart was called as a witness by the prosecution, to prove that he handed the stomach of the deceased, and its contents, to an analytical chemist, Charles H. Porter,

Hartung *v.* The People.

who made the post-mortem examination. On his cross-exami-
nation, Rheinhart gave evidence tending to show that the
symptoms of inflammation observed about the stomach and
intestines of the deceased, led to the conclusion that the irri-
tating matter or poison was introduced into the system a month
or two before death. This was adverse to the theory of the
prosecution. Professor Porter was then called as a witness on
the part of the prosecution. He gave evidence of the *post-
mortem* examination, of the finding of arsenic in the stomach
and intestines of deceased, and of the symptoms of poisoning
by arsenic. He was asked whether a physician, by mere
examination of the external surface (of the stomach), and find-
ing indications of inflammation there, could determine with
precision when the inflammation was caused. The question
was objected to, on the part of the prisoner, as immaterial, in-
competent and improper. The objection was overruled, and
the prisoner duly excepted. After the testimony was closed,
the presiding justice charged the jury at length, and no excep-
tion was taken to his charge. The jury retired, and after a
protracted deliberation rendered a verdict of guilty. During
their retirement, they inquired of the attending officer whether
they could not render a verdict of manslaughter. They re-
ceived from him an intimation that they could do so in his
opinion, but were referred by him to their foreman, who there-
upon sent for and consulted the Revised Statutes. They sub-
sequently came into court, and were charged by the court that
a verdict of manslaughter would not be proper under the evi-
dence. The constables sworn to attend the jury, were also
present during their deliberations. Other irregularities were
alleged to have occurred, to wit: that the constables otherwise
interfered with them; that the jurors saw a newspaper report
of the evidence, and made a communication to the presiding
justice, the failure to receive a satisfactory answer to which unfa-
vorably affected their verdict; but these were not sufficiently
proved. The defendant made a motion for a new trial to the
Court of Oyer and Terminer, founded upon these alleged
irregularities. The motion was denied, and the prisoner

excepted to the decision. The prisoner was sentenced to death, but her execution was subsequently stayed, and a writ of error allowed, under which the case comes here for review. Contemporaneously with the argument of the cause, the District Attorney, on notice, moved to strike out from the case so much thereof as incorporated the affidavits and proceedings relating to the motion for a new trial on account of the alleged irregularities, as improperly in the case. The question was reserved. The other facts material to the case, are contained in the opinion of the court.

*W. J. Hadley*, for the prisoner.

*S. G. Courtney*, for the People.

HOGEBOOM, J. Four exceptions have been presented and argued in this case, upon which a new trial is claimed for the prisoner. The first three relate to the admission of evidence on the trial, and the fourth to the refusal of the court below to grant a new trial for alleged misconduct of the jury. We will examine these in their order.

1. The prisoner having been arrested by the sheriff of Albany, and committed to the jail of that county, had a conversation with the sheriff at the jail, about a month after her commitment, upon the subject of a letter alleged to have been written by her. It was introduced by an inquiry by the prisoner of the sheriff, what he thought they would do with her, and the sheriff replied he did not know; it may be it would not be very hard with her; yet he did not know what the evidence was. She then said if she had not written a *letter* she would not have been there. He asked her how she came to direct a (or the) letter to Ferdinand Shultes. She said Reimann told her to direct it so. So much of this evidence as related to the letter was objected to by the prisoner, the objection overruled, and the prisoner excepted to the decision. The general rule is, that the confessions of a party are admissible evidence where called for by his adversary, upon the presumption that a party

is not likely to state his own case more unfavorably to himself than the truth requires, and therefore should not be permitted to object to his own version of a transaction, if his adversary will take the same. In criminal cases, on account of the law's tender regard for the rights of life and liberty, it is required that it should be preliminarily shown that the confession was voluntary—not made under the influence of fear or the excitement of hope. The circumstance that the party was at the time under arrest, is a very proper one to be taken into consideration, but not of itself sufficient to exclude the evidence. It may sometimes furnish additional reason for confiding in the truth of the statement, as giving more seriousness and solemnity to the transaction. The only question in the case in such a contingency, is, is it *voluntary?* was it induced by the fear of punishment or the hope of bettering the condition of the party? was it drawn out by the act or the conduct of the opposite party? or was it made under an excitement or agitation of mind which would probably affect its verity. I am not able to see that the confession in question was obnoxious to any of these objections. The prisoner, so far as we can see, was entirely self-possessed; the arrest had not been recent; the conversation was introduced by herself; no inducements or flattering hopes were held out, unless they are contained in the declaration of the sheriff in reply to her inquiries: "It may be it wouldn't be very hard with her; yet he didn't know what the evidence was." This does not seem to have been said for the purpose of drawing out any disclosure from her, or in the expectation that any disclosure would be made, and might as naturally be expected to operate to discourage, as to invite, any communication from her. It does not seem, therefore, to have been the result of any *influence* exercised over her by the officer; nor can I see that she can be supposed to have been under such excitement or agitation of mind as would tend to discompose her or lead her to say what she did not in reality mean to utter. I think we must go the length of excluding all declarations made by prisoners when under confinement,

or else we must regard this as proper for the consideration of the jury to receive from them such weight as it deserves.

2. The second exception relates to the admission in evidence of a letter alleged to have been written by the prisoner before her arrest. The objection was, that it was not sufficiently proven to have been her handwriting. A witness (Louisa Streit) had sworn to her acquaintance with the prisoner, and to having seen her write; to her opinion that she would know her handwriting, and that the letter in question (which was shown to her) was the prisoner's handwriting. She also testified to having seen her write a letter and two receipts, although she did not critically examine either. Independent of other evidence, I think this was sufficient to allow the letter to be read. There is no precise standard fixing the degree of knowledge which a witness must possess of a person's handwriting to be allowed to express an opinion as to the authenticity of a particular paper. The witness must have seen the party write, and acquired a knowledge, more or less perfect, of the character of the hand, and he is then allowed to express an opinion upon the paper shown. This opinion was expressed in this case, and was given *without objection*, the only objection being to the *sufficiency* of the proof to allow of the letter being read in evidence after this testimony was taken. But there was other and intrinsic evidence justifying, in connection with the evidence of handwriting, the admission of the letter. The prisoner had stated to the sheriff, that if she had not written a letter she would not have been there (in jail); and on being asked how she came to direct a (or the) letter—the witness being uncertain which expression was used—to Ferdinand Shultes, she replied, Reimann told her to direct it so. The letter spoke of her being at Dr. Wetterbee's. She was found there when arrested. It was addressed to Ferdinand Shultes. She had stated to the sheriff that Reimann had so directed her to address a letter. It was addressed on the inside to William. Such was Reimann's name. It spoke of matters in Albany. She had formerly lived there, and did so at the time of the homicide. It referred to her being in great grief and almost

crazy, and to an unhappy disaster or misfortune having befallen her. These had a natural, if not a necessary, connection with the transaction for which she was on trial. A portion of the letter was addressed to her parents, and spoke of her mother's name being Louisa Leopold. Such in fact it was. It requested communications to be addressed to her as "Elizabeth Shuldes." Such was the name under which she was known at Dr. Wetterbee's. The signature to the letter was "Mary Theresa Koehler." Such, it subsequently appeared, was her maiden name. These and other circumstances were sufficiently corroborative of the authenticity of the letter to justify its introduction in evidence in connection with the evidence of Mrs. Streit, and abundantly authorized the jury to conclude it was hers, when this strong presumptive evidence was in no way impeached or contradicted. I cannot believe there was any error committed in this part of the case.

3. The third exception, and that principally relied on by defendant's counsel, was in allowing a question to be put to Professor Porter. I state it in the words of the case, " The counsel for the People then proposed to the witness the following question: 'In your opinion, can a physician, from a mere post-mortem examination of the exterior surface, and the indications of inflammation which he discovers, determine, with any degree of certainty, the precise period of time when such inflammation was caused?' The prisoner, by her counsel, duly objected to such question, first, as immaterial and improper; second, as incompetent. The objections were overruled, and the question permitted, and the prisoner, by her counsel, duly excepted." Under well established adjudications, these objections raised no question as to the *form* of the interrogatory, but only as to its substance. They presented no questions whether *opinions* were competent evidence upon such a subject, for the objection does not state any such specific ground, and such a ground would not naturally be inferred from the character of the objection. Much less do they convey to the mind of the court, or the opposing counsel, that the *point* of the objection was that *Professor Porter* was not one of

the class of persons who were competent to express an opinion upon the subject matter of the interrogatory. And yet this is the principal ground upon which the force of the objection is argued. It is obvious no such question was raised on the trial; and therefore it cannot be presented here. It is not fair to urge that great liberality should be exercised in cases of this magnitude and importance in interpreting the intent of the objector. We must try this matter by the ordinary rules of evidence. Justice requires that the objection should be explicit and clearly intelligible to the court and the opposite party, because only in such case can it be intelligently disposed of by the court, and only in such case can it, if seen to be well founded, be obviated by a withdrawal or change of the question, or by the introduction of additional evidence by the opposite party. (*People* v. *Dalton*, 15 *Wend.*, 585, 586.)

We must therefore confine our attention to the substance of the offered evidence, and determine whether it was immaterial, improper or incompetent. I think it was neither, for the defendant had already introduced evidence on the cross-examination of a former professional witness of the prosecution (Dr. Rheinhart), tending to show that, in his opinion, the irritating matter must have been administered some two months before death; and that the appearances upon the dead body could not be produced by arsenic administered within three days of the time of the death. As the latter was substantially the theory of the prosecution, it became important for them to show that this opinion of Dr. Rheinhart was incorrect, and the question objected to had a direct and legitimate tendency, if answered in the negative, to lead to such a result. It cannot, therefore, be said to have been immaterial, incompetent or improper, and the objection, if tested, as it must be, on its merits and fair meaning, was properly overruled.

But assuming that the objection was broad enough to present the questions argued under this exception, I think, in the first place, that the subject matter of the question was one upon which a professional man or expert might rightfully be called upon to express an opinion. Whether a post-mortem

Hartung v. The People.

examination of the exterior surface of the stomach would enable a professional man to determine accurately when the inflammation supervened, was not a matter as to which unlearned persons or ordinary men could speak with confidence or reliability. It depended upon experience, or familiar acquaintance with the parts affected, their constitution and properties. It was beyond the range of ordinary knowledge. The parts affected were in the living body, hidden from view, and the effect upon them of such an irritating substance as arsenic, administered internally, and the precise time when these effects would be first visible in the form of inflammation upon the exterior surface of the stomach, were matters wholly beyond the range of ordinary knowledge or observation, and peculiarly within the scope of the comprehensive knowledge, large experience and close observation of the scientific man.

So also, if, by an extraordinary stretch of liberality, the objection can be supposed to mean that Professor Porter's profession or precedents had not qualified him to express an opinion upon the matter embraced in the question, I regard the objection as untenable. To answer the question intelligently, would require a knowledge of the nature and properties of the stomach, of the foreign substance introduced into it, and of the effect of contact or combination between the two. I regard this as in an eminent degree within the province of the chemist, whose legitimate profession is to inquire into the nature and properties of matter, and of a combination or union between the elements of which different substances are composed. A chemist, therefore, would, I think, be quite as competent to answer such a question intelligently and satisfactorily, as a physician whose appropriate business was to cure and remove disease. This might require a knowledge of the nature and constitution of the affected part, and of the foreign ingredients introduced into the stomach. And I do not deny that a *physician* would be competent to answer the question. But his competency would arise quite as much from the knowledge of chemistry, which is essential to make the skillful and accomplished physician, as from any other department of medical

science. But if it were necessary that Professor Porter should be a physician in order to make him competent to answer the question, I think the case shows him to belong to that profession, or at least to have the knowledge requisite in that department of science to solve the inquiry propounded. It is conceded and expressly proven that he was a professor of chemistry. It is further proved that he had had experience in *post-mortem* examinations, with a view to the detection of poison; that he could determine whether arsenic was placed in the stomach before or after death. He testified, without objection, that a portion of the arsenic was, in his opinion, removed by purging and vomiting, and absorption into other organs; that the person died from the effects of the arsenic; that he could and did form an opinion as to the length of time that elapsed between the administration of the arsenic and the death, and that it was administered not long before death; that arsenic was a soluble poison; that his *profession* led him to become acquainted with the symptoms of poisoning by arsenic, which symptoms he details, as also the quantity necessary to produce death; that, among other things, inflammation of the stomach and of the smaller intestines, and also of the œsophagus, would be likely to ensue. Now, several of the matters here detailed are founded purely, or at least principally, upon medical, in distinction from merely scientific or chemical knowledge, and would scarcely have been allowed to be stated without objection, unless it had been known or assumed that the witness was a physician or medical man. At all events, they evince precisely the kind of knowledge which, as applied to such a question, a physician would be expected to have or require. The witness is, therefore, shown by the evidence to possess the knowledge and skill belonging to the profession of a physician, and must be regarded as competent to pronounce such opinions upon this subject as physicians are competent to do. But it is said that, by the question, one physician was, in effect, called upon to pronounce upon the competency or scientific attainments of another, and that this was improper. But the question does not assume that

Hartung *v.* .The People.

aspect, and is not presented in that form. The question is general: Can a physician—can *any* physician—or person skilled in that department of scientific knowledge, determine the precise period of access of inflammation? Is it possible, in your opinion, to do so? The answer to this might be a *disagreement* with the previous witness; but that would not render the question improper. Such questions are of every day occurrence, and it is proverbial that "doctors disagree." But there was nothing that I can discover, in the form or scope of the interrogatory, that makes it justly obnoxious to this last named charge. In every aspect, therefore, in which this exception can be examined, I regard it as untenable. These exceptions embrace all the matters which respect the admission or rejection of the evidence at the trial, or the instructions of the court to the jury, and I think all which are the legitimate subjects of exception.

4. But the defendant's counsel have taken and argued a fourth exception, to wit: to the refusal of the Court of Oyer and Terminer to grant a new trial for alleged misconduct of the jury. This alleged misconduct consists of several particulars. 1. That the jury, during their deliberations, improperly possessed themselves of a copy of the Revised Statutes, and consulted the same. 2. That in like manner they obtained and consulted a newspaper containing a report of part of the evidence. 3. That the officers having the jury in charge, were present all or most of the time during their deliberations. 4. That the verdict was rendered under the improper expectation that the prisoner would never be executed. 5. That the jury improperly sent a communication to the presiding judge without the knowledge of the accused or her counsel, or of the other members of the court. The application to set aside the verdict upon these grounds, was properly made to the court which tried the prisoner, and was refused by them, as to the second, fourth and fifth objections, upon the ground that they were unsupported by sufficient evidence and unfounded in fact; and as to the first and third objections, that no actual detriment ensued to the prisoner, inasmuch as though one or

more of the officers were in the room, no improper communication prejudicial to the prisoner took place between them and the jury, and that although the jury did, at one period of their deliberations, examine portions of the Revised Statutes touching the offences of murder and manslaughter, they subsequently appeared in court and were specifically and imperatively instructed by the court as to the nature of those offences and the discrimination between them.

I do not regard it as essential to travel over the entire evidence relied upon to establish the existence of these irregularities. I concur in the conclusions to which the court below arrived in regard to them on the questions of fact. This disposes of the second, fourth and fifth objections, without the necessity of further remark. The first and third specifications were charges of mere irregularities—censurable ones it is true, but not resulting in any actual prejudice to the prisoner; and I think we may safely dispose of them on that ground, expressing our concurrence in the views of the court below upon those points. (*People* v. *Hartung*, 17 *How. Pr. Rep.*, 85; *Baker* v. *Simmons*, 29 *Barb.*, 198; *People* v. *Carnal*, 1 *Park. Cr. R.*, 256.) But it may be proper to say that we do not regard these irregularities as the subject of exception, so as to present them for review in this court. Exceptions properly relate only to matters of law arising upon the trial of the cause. The law expressly limits the taking of exceptions to matters occurring at the time of the *trial*. (2 *R. S.*, 736, § 21; *Ib.*, 422, § 73.) The subject has been frequently before the courts, and the decisions, so far as I know, have been uniform against entertaining jurisdiction to review any errors except such as occurred strictly at the trial. (*People* v. *Haynes*, 11 *Wend.*, 561; *People* v. *Dalton*, 15 *Wend.*, 583; *Freeman* v. *The People*, 4 *Den.*, 21; *Wynehamer* v. *The People*, 2 *Park. Cr. R.*, 382.) These decisions are to the effect of excluding everything from the consideration of the court of review, except what occurs in the progress of the trial, and on the trial of the main issue. No matters which either precede or follow the trial are subjects of exception. Thus, in *The People* v. *Haynes*, objections that

the verdict was against evidence, and that the court erred in their comments upon the testimony, were disregarded. In *The People* v. *Dalton*, objections to the insufficiency of the evidence to make out the crime, and a motion in arrest of judgment, were disposed of in the same way. In *Freeman* v. *The People*, the same disposition was made of exceptions taken on a preliminary issue to test the insanity of the prisoner. In *Wynehamer* v. *The People*, decisions made on a motion to quash an indictment, on the grounds of irregularity in organizing the grand jury, and on the trial of an issue joined on a challenge to the array of jurors, were held not to be reviewable on a bill of exceptions; and although in the case of *Eastwood* v. *The People* (3 *Park. Cr. R.*, 25), affidavits were allowed to be read, and were considered in the Supreme Court, when the case came there on a bill of exceptions from the Monroe County Oyer and Terminer, no objection was taken to their being so read, and the question of their admissibility was not considered. (*See page* 27 *and Reporter's note a*.) The fact that Courts of Oyer and Terminer now entertain motions for new trials, furnishes no reason for sustaining an exception to their decision in the disposition of such motions. We cannot enlarge the statute, and the decision of motions of this character, so far as they concern the weight of evidence or questions of irregularity, were never reviewable on exception or writ of error in a superior tribunal. (*The People* v. *Haynes*, 11 *Wend.*, 562; *Pelletreau* v. *Jackson*, 7 *Wend.*, 471; *The People* v. *Rathbun*, 21 *Wend.*, 546 to 551.) This court, therefore, sits only to review matters of law, and not to correct all irregularities which attach to the proceedings in the court below. These last pertain more especially to the orderly conduct of the cause in the tribunal of original jurisdiction—are mostly matters of practice, and some of them were matters of discretion, and all of them presumed to be controlled and directed by the trial court, in a manner to subserve the ends of justice. It would be intolerable if every alleged irregularity was susceptible of review in the appellate tribunal. It would involve a vast consumption of time and a vast increase of expense. Hundreds

of questions are every day disposed of in every court, and in this court at the circuit and special term, which can never go further. A proper degree of confidence must be entertained in the ability and willingness of courts of original jurisdiction, properly and justly to dispose of the questions presented to them. Litigation must cease at some point, and we should accomplish in fact a less amount of practical good if we allowed parties to carry up to our highest tribunals every debateable question presented in the progress of the whole proceedings. It is sufficient to say that the law countenances no such course, and the practical remedy must be, where, notwithstanding all these precautions apparent and serious injustice has been done, by an appeal to the pardoning power. This will probably be found to be an ample and efficient remedy, when the emergency of the case requires its application. If we are right in these views, that part of the case which contains a history of the proceedings, so far as it is intended to show the misconduct of the jury, has no proper place there, and the motion to strike the same out of the case should be granted. A bill of exceptions should contain no more of the case than is necessary to present the questions of law actually raised, and which are the legitimate subjects of exception. But as the question is pressed with much confidence by the learned counsel for the defendant, and the issue is one of vast importance to the prisoner, we allow the matter sought to be expurgated to stand, notwithstanding our clear opinion that it forms no proper part of the case, to enable the prisoner, if she is so advised, to present the questions to the court of final resort.

We have given to this case a careful and deliberate examination, and are brought to the conclusion that no error of law, to the actual prejudice of the prisoner, has been committed. Her remedy, if any exists, lies elsewhere, and while we may commisserate her unfortunate condition, as we should that of any of her sex similarly circumstanced, however guilty, we are not at liberty to interpose any obstacle to the due execution of the law. The judgment of the Court of Oyer and Terminer must be affirmed, and the record and proceedings remitted

Hartung *v.* The People.

to that tribunal, with directions to enforce the judgment of this court.

GOULD, J., concurred.

WRIGHT, J. (Dissenting.) I am not able to agree with my brothers, *Hogeboom* and *Gould*, that it was not error in allowing the question to be propounded to and answered by Professor Porter. The question was: "In *your* opinion, can a physician, from a mere *post-mortem* examination of the exterior surface, and the indications of inflammation which he discovers, determine, with any degree of certainty, the precise period of time when such inflammation was caused?" The prisoner's counsel objected to the inquiry, *first*, as immaterial and improper; *second*, as incompetent. The court overruled the objection, and the witness answered in the negative.

It is now said that the specific objections were not taken, either that the opinion of the witness upon the subject matter of the inquiry was not competent evidence, or that the witness had not been shown to be qualified to express an opinion upon such subject matter. In a case of this magnitude, I am not inclined to enforce a technical rule with rigid strictness. It ought not to be that human life should depend, in any degree, upon the skill and adroitness of counsel in stating objections. Although, in the humane spirit of our criminal jurisprudence, we allow a prisoner to be defended by counsel, and oftentimes, as in this case, assign counsel for that purpose, yet the court is not thereby relieved from the responsibility once resting upon it, to see that no objectionable evidence is received to the prejudice of the accused, or that no injury results from the unskilfulness of counsel. Besides, if the objection cannot be obviated, or the testimony made competent by additional proof, the rule does not apply.

There was no evidence that the witness Porter was, or ever had been, a practitioner of medicine, or that he had familiarized himself by study or practice with the mysteries of the healing art. He was a professor of chemistry, but a knowledge

of chemistry is but one of many qualities that make the *physician;* and it does not necessarily follow that a chemist is familiar with the structure and properties of the human system.

It is possible, however, that the objection that he was not of the medical profession, might have been obviated by additional proof; but had this been done, if the opinion, even of a physician, was incompetent, it would be covered by the general objection of incompetency. No one will pretend, that unless the opinion asked was exclusively upon a scientific subject on which it was important that the jury should be enlightened, that it was material or competent.

The purpose of the interrogatory is obvious from the case. It was not to elicit information on a scientific question beyond the range of ordinary knowledge; but if the witness answered in the negative (as he did), to impress the jury with the conviction that from the imperfect nature of the *post-mortem* examination, the opinion of Dr. Rheinhart (who had made it), that the irritating matter which caused the death of Hartung must have been taken into the stomach two months before death, was unreliable. It was not the intention to enlighten the jury upon any matter of science with which they were not supposed to have familiarity. The nature and subtlety of arsenic or other poisons, in the organism of the stomach and œsophagus, were not inquired into; in short, nothing from which it might be inferred by the jury that the mere observance of inflammation on the exterior surface of the parts affected, would not enable the man of science to approximate to the period of time when such inflammation commenced. The witness had been put in possession of the parts affected immediately after the *post-mortem* examination, with full opportunity to observe their appearances and the extent of inflammation; but it is to be observed, that he was not asked, as an expert, whether, from indications of inflammation that he discovered, he could "determine, with any degree of certainty, the precise period of time when such inflammation was caused." He had already substantially answered this question, and expressed the opinion that the irritating matter adminis-

tered to the deceased was arsenic, and that death must have ensued within a very few days. Nor was the inquiry, whether a physician, under any circumstances, could determine with proximate accuracy when the inflammation caused by irritating matter taken into the stomach commenced, but whether a physician, from the indications of inflammation which he may discover upon a *post-mortem* examination of the exterior surface of the stomach, intestines, &c., can determine it. Dr. Rheinhart had been called by the prosecution, and testified that he was a practising physician and surgeon, and had made a *post-mortem* examination. On his cross-examination, he stated that, in his opinion, the irritating matter which caused the death of Hartung, had been taken into the stomach two months before death. On re-examination by the prosecution, he testified that he was familiar with the appearances produced by arsenic, and that the cause of Hartung's death was inflammation of the œsophagus and stomach. In answer to a question from the court, he stated that the appearances which he observed could not have been produced by arsenic. administered within three days of the time of the death, and that such appearances were sufficient of themselves to produce death.

Rheinhart's theory obviously was, that Hartung had died from the administration of a slow poison. This was antagonistic to the theory of the prosecution, which was, that he died from the administration of arsenic by the prisoner, which had been purchased by her within three days of her husband's death. It had been proved that she purchased arsenic from a druggist in Albany upon a single occasion, which was the Sunday prior to the death, which occurred on Wednesday.

It had been shown that she attended upon her husband in his last illness.

Professor Porter testified that he had found six grains of arsenic in two-thirds of the stomach of the deceased, and expressed the opinion that Hartung died from the effects of arsenic taken, and from the quantity found, that he could not have lived long; it might have been one day or several days. This proof tended strongly to sustain the theory of the prose-

cution, that the death was occasioned by arsenic, and that the prisoner was a guilty participant in the administration of it. But if any force or effect was to be given by the jury to the opinion and testimony of Rheinhart (though the death may have been occasioned by arsenic), it went far to relieve the prisoner from the crushing weight of the inference to be drawn from the fact that she had purchased arsenic within three days of the death.

This was the strongest and most conclusive circumstance connecting her with the killing. In fact, unless the jury believed that arsenic was administered in such quantities as to have produced death within three days, the evidence would not have justified her conviction. There was no pretence that she had purchased or procured arsenic at any other time than the Sunday prior to the death. If the irritating matter which had caused Hartung's death was taken into the stomach two months before dissolution, or if the appearances which Rheinhart observed could not have been produced by arsenic administered within three days of the time of the death, it went far to relieve the case of the strongest circumstance tending to connect the prisoner with the transaction. This evidently was seen by the prosecution, and it was deemed important to discredit the testimony of Rheinhart. Professor Porter was interrogated in respect to the symptoms of poisoning by arsenic, and, although not shown to have ever studied or practised physic, the appearances of death by poison. The examination was allowed to proceed without objection, though, so far as a description of appearances was concerned, it amounted to nothing. He could not certainly tell whether there would be inflammation of the stomach and the smaller intestines, and he presumed, though he could not speak with certainty, that the œsophagus would be inflamed; yet it is urged now that this examination showed the witness to have been a medical expert. It was then that the objectionable interrogatory was propounded to him. It was manifestly pointed at Dr. Rheinhart. He had made the *post-mortem* examination; and in any view other than to discredit his testimony, the inquiry was immaterial and im-

pertinent.   The expression of an opinion whether a physician, from the discoveries of inflammation he might make on a *post-mortem* examination, could or could not determine, with any degree of accuracy, when the inflammation was caused, was entirely irrelevant and foreign to the case on trial, unless pointing to the *post-mortem* examination of Rheinhart.

If there had been no *post-mortem* examination, and Dr. Rheinhart had expressed no opinion as to when the inflammation which he discovered had commmenced, it can scarcely be pretended that there would have been any pertinency or materiality in the inquiry.   The interrogatory was, therefore, aimed at Rheinhart, and with no other purpose, that I can conceive, but to discredit his testimony with the jury, not on the ground of his incompetency as a physician, nor on the further ground that it was not within the scope of medical science, by close and skilful examination, to determine when inflammation was caused with proximate accuracy, but on the ground that the imperfect and hasty examination which he had given the subject, did not qualify him to express a reliable opinion as to when the irritating matter, which had caused the inflammation of the œsophagus and stomach, had been administered.   In no other light was it at all important.   Conceding the witness to have been an expert, it was not necessary for the information of the jury that one expert should be called to express the opinion that another expert, from an imperfect and hasty examination of the surface of the inflamed parts, and from the indications of inflammation which he may discover on such an examination, could not determine, with any degree of certainty, the precise period of time when the inflammation commenced.   It required no medical expert to enlighten a jury of unlearned men on this point, nor was it important to a proper determination of the cause of Hartung's death.   It was a fact (if there was any importance attached to it), that the jury were abundantly able to determine for themselves, after being instructed in the constitution and properties of the parts affected, and the nature and properties of the irritating matter administered internally; and above all, it required not the

skill of an expert to satisfy even an ordinary man that an imperfect and careless examination, even of a skilful and learned physician, would not conduce to accuracy of opinion or judgment.

I am of the opinion that the interrogatory was objectionable for the reasons:

1st. That it called for the opinion of a witness not shown to be a medical *expert;* and, 2d. That even the opinion of an expert, as to the subject matter of inquiry, was incompetent evidence.

Though the witness may have been, and doubtless was, eminent as a chemist, it did not necessarily follow that he was an anatomist or physiologist; nor are the *opinions* of experts always competent evidence. Ordinarily, the jury are to find the facts bearing on the issues involved in the case, and form their own opinions and conclusions. Only in cases where, from the nature of the subject, facts disconnected from opinions cannot be so presented as to enable them to pass upon the question with the requisite knowledge and judgment, are persons of skill allowed to give their opinions in evidence. (*Jefferson Insurance Company* v. *Cotheal,* 7 *Wend.,* 73.) The opinion of a physician, upon a question not involving medical skill or science, is not admissible evidence; and when the jury, after being put in possession of the facts, can judge equally well with the witness, it is not a case for an expert. (*Wooden* v. *The People,* 1 *Park. Cr. Rep.,* 464.) Assuming the inquiry to have been in this case, whether a physician was competent to determine when inflammation commenced, the reasons stated by the witness Porter, and upon which he based his opinion, clearly showed that the question put to him was not a scientific one. These reasons were because "different substances might be used, which would produce more or less quickly, and to a greater or less extent, the inflammation." The facts there stated would enable the jury to pass upon the question of competency, without the aid of opinion. They were reasons which one intelligent man could understand and appreciate as well as another, and furnished the jury with all the knowledge that

Hartung *v.* The People.

they required to draw the requisite conclusion. Under such circumstances, the aid of the opinion of an expert was not required; and if not, such opinion was inadmissible.

But the interrogatory was restricted to the case of a physician who merely made a *post-mortem* examination, and relies upon an imperfect and meagre examination of the exterior surfaces of the parts inflamed; and in this view, if the inquiry was a scientific one in part, it was not wholly so. If the *capacity* generally of the medical profession be the proper subject for the opinion of an expert, the inquiry should not be limited to the case of a physician who exercises his profession under peculiar circumstances, and when the jury are quite as well able as the expert to determine whether such circumstances do or do not conduce to accuracy of opinion or judgment. But the *competency* of the medical profession, under any circumstances, is not, in my judgment, ever to be determined by the opinions of experts. Opinions are only admissible when the nature of the inquiry involves a question of science or art, or of professional or medical skill, and then only from witnesses skilled in the particular business to which the question relates. This was not a case in which the adage that "doctors are dangerous" has any real application.

In *Leighton* v. *Sargent* (11 *Foster*, 119), upon a question made as to the degree of skill possessed by a surgeon, the Supreme Court of New Hampshire held that the opinions of physicians were not competent evidence upon that question, and that opinions are never to be received when it is supposable that jurors can form a correct judgment without the aid of the opinions of others, from the facts being stated to them. Witnesses should never be allowed to usurp the province of the jury, except from necessity. In the present case, the witness was not asked whether *he*, as a physician, could reach any conclusion upon the subject matter of the inquiry, for, as regarded himself, he could speak with positiveness, but, substantially, whether the medical faculty, with full knowledge of the structure of the stomach and other parts affected, and the more or less irritating properties of different poisons, could determine,

with any degree of certainty, from an examination of the exterior surface of the inflamed parts, when inflammation commenced. Then the witness was asked to sit in judgment on the skill and capacity of the medical faculty in general, and Dr. Rheinhart in particular, for the benefit and information of the jury. I think it will be difficult to find any precedent for such an inquiry, and I am at a loss for any sound or safe principle on which to rest it. It is begging the question to say that the fact sought to be elicited was one of science bearing on the issues in the case, and without the range of ordinary knowledge, and which the jury were to be supposed incapable of finding without the aid of a professional opinion.

It is urged by the counsel for the defendants in error, that the question and answer, if improper, was really unimportant in the case, and worked no injury to the prisoner. I cannot see the matter in this light, nor do I understand my brethren to question the materiality of the evidence. Professor Porter and Dr. Rheinhart had evidently opposite theories respecting Hartung's death—the latter, that he died from the slow administration of poison; the former, that his death was caused by administering arsenic in such quantities as to produce death within one, two or three days.

The prosecution seems to have leaned towards both of these theories in the progress of the trial. When Professor Porter came to testify that he had found some six grains of arsenic in two-thirds of the stomach of the deceased, and that three or four grains had been known to produce death, if the evidence was credited the inference became almost irresistible that the deceased was poisoned by arsenic, and that a sufficient quantity had been administered to produce death in a very brief period of time. If the testimony of Dr. Rheinhart was to be credited (and he was put on the stand as a witness by the prosecution), the appearances which he observed could not have been produced by arsenic administered within three days of the time of the death, but the irritating matter of which the deceased died must have been taken into the stomach two months before death. It was not pretended or shown that the prisoner had

purchased arsenic at any other time than the Sunday prior to the death. This circumstance lost much of its weight if the death was not occasioned by arsenic administered within three days of the time of dissolution. The tendency of Dr. Rheinhart's testimony, if worth anything, was to relieve the prisoner from the weight of the inference to be drawn from the fact that she had purchased arsenic three days before the death of her husband. The theory was, that the death was effected by the very poison that she had procured at the druggist's three days previously. If Rheinhart was correct in the opinion which he expressed, the fact that the prisoner purchased arsenic shortly before the death of her husband, lost much of its weight and significance.

The effect of the opinion of Professor Porter was to deprive her of the benefit of the opinion of the physician in her favor. It told the jury, in effect, that the physician was not capable of forming the opinion that he had expressed. At all events, the evidence was calculated to make that impression on the minds of the jury, and it is impossible to say that it did not influence the verdict.

Upon the ground stated, I am in favor of reversing the judgment of the Oyer and Terminer. I think there was error, and it is easily to be seen that the prisoner may have been prejudiced thereby.

There was an application made to the Oyer and Terminer for a new trial, on the ground of irregularity and misconduct of the jury, and the officers attending them. The motion papers show that one of the jurors inquired of a constable in attendance whether the jury could bring in a verdict of manslaughter, stating that if they could do so the whole jury would agree on such a verdict. The constable replied that he thought they could, adding that they had better consult their foreman, who, being a justice of the peace, would probably know. Subsequently, the Revised Statutes were sent for by the jury, and such parts thereof as related to the crimes of murder and manslaughter examined. On Sunday evening (after the jury had been out more than twenty-four hours), one of the jurors for-

warded to the presiding judge a written communication of this tenor: "If the annexed question can be answered in the affirmative, then will you be kind enough to convene the court and answer such question, and receive our verdict, otherwise return this note. '*Q*. If the jurors, after the most careful and laborious investigation, are *absolutely unable* to find which of the inculpated parties is most guilty, then can a verdict of not guilty be rendered in this case?'" The court was not convened until the next morning, when the jury stood equally divided upon the question of the prisoner's guilt; and after being told by the presiding judge that he could conceive of no aspect of the testimony in the case that would warrant them in finding any other verdict than guilty or not guilty of the crime with which the accused was charged; and that a verdict of manslaughter would not be sustained by the evidence, they again retired, and returned in a few minutes with a verdict of guilty. During the deliberations of the jury, one or more of the three constables, sworn to attend them, were constantly present in the jury room. The eminent judge who presided in the Oyer and Terminer, well characterized the proceeding on the part of the jury, in consulting with a constable as to the law, and then sending for and examining themselves the provisions of the Revised Statutes in relation to the crimes of murder and manslaughter, as a reprehensible irregularity. The court, however, arrived at the conclusion that no injury had resulted from it to the defendant, and that the verdict had not been affected in the least degree by the impropriety of the jury in seeking to inform themselves as to the law, and finding no other charges of misconduct sustained by proof, denied the motion for a new trial. We are now asked to review this decision. I think that we are without the power to review it. We cannot review the action of a Court of Oyer and Terminer in granting or refusing a new trial on the merits, or on the ground of misconduct of the jury, but are confined to errors of law appearing on the record or in the bill of exceptions. The motion papers in the Oyer and Terminer, I think properly form no part of the record. It is for this reason alone that I refrain

Hartung *v.* The People.

from discussing the merits of this question. My brethren think that the motion was properly decided, and very probably it was; but I may say this for myself, that where a jury was shown to be guilty of the glaring misconduct of advising with a constable as to the law of the case, and examining for themselves the statutory provisions relating to the offences of murder and manslaughter, though subsequently instructed by the court as to these matters, I should hesitate long in coming to the conclusion that the accused could not possibly be prejudiced thereby, and hence that such misconduct was insufficient to vitiate the verdict.

Judgment affirmed.