Barrett, J.
The plaintiff files his bill as a stockholder of the American Union Telegraph Company to restrain the consummation of an agreement for the sale of the entire assets and property of this corporation to the Western Union Telegraph Company. This relief is claimed upon several grounds. In the first , place, it is averred that the American Union Telegraph Company was created and its stock subscribed for with a view to the establishment and maintenance of an independent telegraph company which should have for its principal object healthy competition with other telegraph companies (then enjoying a practical monopoly of the business), the lowering of rates and the consequent furthering of the public interests. The plaintiff charges that this understanding, inherent, he says, in the very structure of the company, is to be nullified by the proposed action.
One difficulty with this position, and the only one which need be dwelt upon, is the entire absence of any binding compact upon the subject. What was in the mind of the original promoters of the enterprise can have but little bearing upon the practical question now presented for our consideration, namely, the legality of the proposed scheme. The statute (2 Laws 1870, c. 568, p. 1327) under which this inchoate agreement of sale has been made, was in existence at the time of the organization of the American Union Telegraph Company. That company was therefore incorporated with all the rights and powers conferred by such enactment. That, is, unless something more is shown than a mere condition of mind upon the part of the promoters, corpora- *226 tors and subscribers. Now, whatever may have been the purposes and objects of the promoters and corporators, with whatever understanding or intent the original subscribers to the stock may have come forward, not a word expressive of such purpose, object, understanding or intent, nor "in anywise limiting the powers of the corporation, its directors and stockholders, under the law, was embodied in the certificate of incorporation. Nor was there any contract of restriction between such corporation and its promoters, corpora-tors or stockholders, nor between all or any of the latter classes.
Further, even the fact that the shares upon which this action is founded were acquired by the plaintiff as an original subscriber, and not by subsequent purchase, is left to vague inference. The allegations even as to intent and purpose are equally indefinite. The defendants, upon the other hand, show that the entire capital stock of the company was originally issued to and paid for by three subscribers, of whom the plaintiff was not one. They also show that no restrictive agreement was ever made, none which would prevent the corporation, its directors and stockholders from taking advantage of the provisions of the act to which we have referred.
The real question, we apprehend, is whether the agreement in question is within this statute. It all depends upon that, for we need scarcely say that without some such direct legislative authority this transaction would simply amount to a gross breach of trust, and would be utterly void.
The act is in these words (2 Laws 1870, c. 568, p. 1327): “ Section 1. In order to protect and extend the connections of telegraph companies in this State, and to promote their union with the telegraph systems of other States, any telegraph company organized under the laws of this State, may lease, sell or convey its *227 property, rights, privileges and franchises, or any interest therein, or any part thereof, to any telegraph company organized under or created by the laws of this or any other State, and may acquire, by lease, purchase or conveyance, the property, rights, privileges and franchises or any interest therein or any part thereof, of any telegraph company organized under or created by the laws of this or any other State, and may make payments therefor in its own stock, money or property, or receive payments therefor in the stock, money or property of the corporation to which the same may be sold, leased or conveyed ; provided, however, that no such purchase, sale, lease or conveyance by any corporation of this State shall be valid until it has been ratified and approved by a three-fifths vote of the board of directors or trustees, and also by the consent thereto, in writing or by vote, at a general meeting duly called for the purpose, of three-fifths in interest of the stockholders in such company present or represented by proxy in such meeting.”
We have read and reread this act with a determination to acquire complete and absolute conviction before admitting that it conferred the extraordinary power now claimed for it. But after much scrutiny and reflection, we find it impossible to resist its plain, unambiguous, comprehensive, all-embracing language. The draftsman. was indeed expert. He has not left a loophole for construction ; nothing upon which to base a limitation or to apply even that somewhat unsatisfactory and fluctuating, if not dangerous, method of interpretation, a personal impression of what 'the Legislature ought to, and therefore must, have intended.
The legislative intent cannot very well be severed from such legislative language, nor can the power be denied without ignoring simple words, expressive of a single, pointed, well-understood idea ; in fact, without substantially eliminating a part of the act itself.
*228 We agree with the view which Mr. Justice Yak Brunt took of this act in Benedict against the Western Union Telegraph Company (supra, p. 221). The following observations of that learned and able judge are pertinent: “What arrangements two telegraph companies could make in reference to the conduct of their business which would not be protected and come within the scope or meaning of the foregoing acts, I am totally at a loss to imagine. They may consolidate; they may construct, maintain and use lines of telegraph not mentioned in their original certificate of incorporation ; they may jointly construct, lease, sell or buy any telegraph property, rights, privileges and franchises or any interest therein, or any part thereof, paying and receiving in payment therefor stock, money or property. It would seem to have been the intention of the Legislature to give to telegiuph companies the power to make any and all arrangements for the conduct of their business, either jointly or separately, which natural persons could possibly enter into, requiring in some instances to such arrangements the consent of three-fifths or two-thirds, as the case may be, of the directors and stockholders of the corporation.”
The learned counsel for the plaintiff rely mainly upon the few prefatory words with which the act opens. They insist that the power conferred by the enactment clause is thus limited to cases where the company, when challenged in a court of equity, can establish to the satisfaction of the court that the proposed agreement of purchase and' sale, if completed and executed, will “perfect and extend the connection” of the telegraph company then vendee, “in this State,” or “promote its union with the telegraphic systems of other States.” We are of opinion that under well settled rules no such effect can be given to these prefatory words. Strictly speaking, there is no formal preamble to this bill. The prefatory words are *229 really a part of the enacting clause. But viewed in the light of a preamble, which is the utmost that can be claimed for it, let us see what are the governing rules.
The preamble of a bill may be referred to when the meaning of the enacting part is doubtful (4 Term R. 793), but not to restrain its meaning when it is clear and unambiguous (6 Bac. Abr. 380; Jackson v. Gilchrist, 15 Johns. 89, 116; Constantine v. Winkle, 6 Hill, 177). Though it may assist in construing ambiguous expressions, it cannot" control clear ones (Potter’s Dwarris, 108, citing Salters Co. v. J. 3, 2 B. R. 109). Sedgwick, in his work on Statutory and Constitutional Law (page 43), says :' “ Where the intention is- clearly expressed in the purview, the preamble shall not restrain it, although it be pf much narrower import.” So in Maxwell’s Interpretation of Statutes (page 39) it is said that “ the preamble cannot either restrict or extend the enacting part where the language of the latter is plain and not open to doubt, either as to its meaning or its scope.”
In Doe dem. Bywater and Brandling (7 B. & C. 643) it was held that where “the courts find in the preamble, or in any particular clause an expression not so large and extensive in its import as those used in other parts of the act, it is their duty to give effect to the larger expressions.”
In the present instance the Legislature having specifically granted the power in the enacting part of the bill, it must be assumed that it considered the exercise of such power as promotive of the ends referred to in the declaratory sentence. And indeed how is it possible for the court, at this time and under present circumstances, to lay it down as settled fact that the agreement in question tends neither to perfect nor extend the connections of the Western Union Telegraph Company in this State, nor to promote its union with the telegraph systems of other States % We have no *230 data, and it would, we conceive, in the very nature of things, be quite impossible to furnish data sufficient to justify a distinct finding that the present proposed exercise of power under the enacting part of this bill, could not possibly promote the end contemplated by the prefatory language.
We next come to the method devised for the payment of the consideration for the transfer, and the distribution of the stock which forms such consideration. This seems to be unobjectionable ; a mere matter not of substance but of detail. It is immaterial, so far as the legal rights of the plaintiff are concerned, whether he receives his due proportion of such consideration directly from the corporation vendor or from the depository trustee which.it has been deemed convenient to designate. It is sufficient for the court, looking to the plaintiff’s practical interests, that proper provision has been made for the payment of the consideration and its regular and orderly distribution among the vendor’s stockholders. The rest is a matter of sentiment, as to which the plaintiff and all other stockholders are at perfect liberty to express their pleasure at the meeting called to ratify the agreement. Upon this branch of the case they are certainly in no need of the assistance of a court of equity.
It is also urged that the consummation of this agreement will result in giving to the corporation vendee a practical monopoly of the business of telegraphy in this country; that competition, for the present at least, will be at an end, and that the Western Union Telegraph Company will thus have the power to increase rates with substantial impunity. All this is vehemently denounced as contrary to public policy, and in its tendency injurious to trade and commerce.
The court has listened with solicitous interest, nay, more, with profound concern, to the arguments pro *231 and con upon this momentous question. But we could not help thinking at the time—and that thought, upon mature deliberation, has ripened into a conviction— that such considerations are more properly to be addressed to the legislative body. Our duty begins with the ascertainment of what the law is. It ends with its application and enforcement.
Story, in his Conflict of Laws (p. 17), says “ that arguments drawn from impolicy or inconvenience ought to have little weight. The only sound principle is to declare it a lex scrvpta est, to follow and to obey.” So in the Inhabitants of St. Gregory, quoted by Dwarris (Potter, 50, p. 214), one of the learned judges (Williams) observed : “The ground of public policy is a very unsafe one ; it is best to adhere to the words used in the act of Parliament.” It is idle in this particular connection to talk of any other public policy than that embodied in constitutional legislation. We may here remark that not a doubt has been intimated as to the constitutionality of the act in question. Clearly, then, it must control. But this act of 1870 is not the only indication of legislative intent. A like general policy runs through the telegraphic legislation of this State. Thus, we find that as far back as the year 1851 an act was passed (L. 1851, c. 98) giving the trustees of any telegraph company power, with the consent of owners of two-thirds of its capital stock, to unite with any other incorporated telegraph company. Again, in 1853, authority was given (L. 1853, c. 471) to own, construct, use or maintain telegraph lines, whether wholly within or partially beyond the limits of this State; and corporate powers were granted to enable any telegraph company to own any interest in such line or lines. So, it was provided by chapter 425 of the laws of 1862 as follows : ‘1 Any telegraph company which is duly incorporated under and in pursuance of *232 the act entitled £ An act for the incorporation and regulation of telegraph companies, passed April 12, 1848,’ may construct, own, use and maintain any line or lines of electric telegraph not described in their original certificate of organization, whether wholly within or wholly or partially beyond the limits of this State, and may join with any other corporation or association in constructing, leasing, owning, using or maintaining such line or lines and may own and hold any interest in such line or lines, and may become lessees of any such line or lines upon’ the terms and conditions, and subject to the liabilities prescribed in such act, so far as such provisions are applicable to the construction, using, maintaining, owning or holding of telegraph lines or any interest therein pursuant to the provisions of this .act.”
These various enactments serve a two-fold purpose. First, they indicate a persistent course of policy. Then they lead up to the act of 1870, and strengthen the belief that that act was but the culmination of a general legislative purpose.
They consequently leave us without excuse, in the course of such prior legislation, for the assertion that the law-makers could not in the act of 1870 have meant what in' terms they have said. It is plain, therefore, that the natural import of the words used is not repugnant to any acknowledged principle of state policy with regard to telegraph companies.
We repeat, then, that considerations of policy, in the sense of general public feeling, cannot avail in the courts against express legislative authority constitutionally granted. We are not to feel the public pulse before making up our minds to enforce the law. That would be an unwarrantable usurpation of the legislative function, and would throw all legal rights into a sea of doubt and confusion. As was said by Chief *233 Justice Marshall, in Osborne v. United States Bank (9 Wheat. 738-866), “judicial power is never exercised for the purpose of giving effect to the will of the judge —always for the purpose of giving effect to the will of the legislature, or in other words, to the will of the law."
The court may even have a pretty decided opinion as to the transaction under consideration, but no useful purpose is served by the expression of an opinion not essential to judicial judgment. If we cannot properly restrain these people by such judgment our opinion as to their conduct will have little weight to check the completion of their design.
The cases cited under the statute which provides that “if two or more persons shall conspire to commit any act injurious to trade or commerce, they shall be deemed guilty of a misdemeanor ” (2 R. S. 691, 8), are entirely inapplicable. The acts which were condemned by these cases (see notably Hooker v. Vandewater, 4 Denio, 35; and Stanton v. Allen, 5 Id. 434) were not authorized by a special statute. How is it possible to treat that which the law authorizes as a criminal violation of law ? It will be found, too, that the cases under the Revised Statutes were either criminal prosecutions or actions at law between parties in. pari delicto.
We have found no case where equity interfered by injunction to restrain acts punishable under the statute. This branch of the case need not be further considered.
Nor need we dwell at any length upon the charges and countercharges of a purely personal character. The individual defendants were certainly not disqualified as directors from entering into this initial agreement, merely because as stockholders they profited by it. That is a strange grievance to be put forward by a stockholder who has himself profited by the appreciation of Ms stock consequent upon the very acts of which he complains, if this appreciation is fictitious or ephemeral, if the agreement is really contrary to the *234 best interests of these stockholders, they have the matter in their own hands. Their adverse vote will end the whole matter. We are told that requisite three-fifths of the stock is already in the hands of the individual defendants or their associates in the scheme. If that be so it is their right to exercise the power which the possession of such interests confers upon them. The court cannot interfere with them so long as they keep within the law: and that, as we have. seen, they have thus far succeeded in doing. It may be an abuse of their power; it may, even, as the plaintiff asserts, be a blow aimed at the people. But the responsibility for this state of things rests upon the legislature which provided the weapon. All the questions presented by the learned counsel have thus been gone over, more fully, probably, than was necessary. Under ordinary circumstances a simple reference to the act of 1870 would have sufficed; but the discussion at the bar was so thorough and exhaustive, and the interests involved, are so great, that we felt it to be our duty to touch upon every point in the case. The proofs with regard, to the plaintiff’s use of the temporary injunction have not so far been noticed, for the reason that we thought it better to pass upon the merits at once. We feel bound to say, however, that if the general result had been otherwise we should still have felt constrained to deny the present injunction, because of the course which the plaintiff pursued with regard to it. A party coming into court and seeking equitable relief must apply in perfect good faith. The court will not permit its process to be procured and used merely for ulterior purposes entirely foreign to the ostensible object of the suit, nor will it permit a plaintiff to traffic in such process for purely speculative purposes. In every aspect of the case personal to himself, or as the self-authorized representative of other stockholders (none of whom *235 have, indeed, appeared or come in, except to protest against the suit) the plaintiff fails. There are averments in the complaint which would seem to indicate that the plaintiff either supposes his bill to be filed upon behalf of the community, or else that the state of public opinion and feeling is a legitimate factor in support of his stockholder’s bill. The latter is the only correct view of the plaintiff’s attitude, and it may as well be understood that the remedy, so far as the public is concerned, is not in the hands of individuals seeking personal ends, but with the chosen representatives of the people in the legislative body. It is there, and there alone, that the power lies and the responsibility rests.
The motion for an injunction denied, and the temporary injunction dissolved, with $10 costs.