ESSEX COUNTY COURT OF OYER AND TERMINER.

STATE OF NEW JERSEY

*v.*

HARRISON W. NOEL.

[Decided October 8th, 1925.]

Crimes—Murder—Insanity—Competency of Defendant To Go on Trial—Experts Find Defendant Suffering From Dementia Praecox or Mental Deterioration—Defendant Found Capable of Understanding His Position and Advising With Counsel—Mere Incapacity to Fully Understand Legal Rights and to Make Known to Counsel All Facts Material to Defense is Not Sufficient Ground For Delaying Trial—Impossible to Lay Down Fixed Rule.

On indictment for murder.

*Mr. J. Victor D'Aloia,* assistant prosecutor of the pleas for Essex county, for the state.

*Mr. Merrill Lane,* for the defendant.

CAFFREY, J.

Harrison W. Noel has been indicted, charged with the murder of Raymond Pierce. The defense contends that the prisoner is insane and not able to comprehend his position or to rationally consult with counsel in the preparation of a defense. Therefore, the precise question raised and decided in these proceedings is the mental state of the defendant at this time, and only with relation to the issue raised by the defense.

In *State v. Peacock, 50 N. J. Law* (at *p. 36*), Mr. Justice Reed, speaking for the supreme court, said:

"It is undoubtedly the law that a person who, by reason of insanity, is unable to comprehend his position, and of making his defense, cannot be placed upon trial for a crime. If the court, either before or during the progress of such a trial, either from observation or upon the suggestion of counsel, has facts brought to its attention which raises a doubt of the condition of defendant's mind in this respect, the question should be settled before another step is taken. The method of settling this preliminary question where it is not the subject of statutory regulation is within the discretion of the trial court. The court can itself enter upon the inquiry, or submit the question to another jury empaneled for that purpose." The court cites the case of *Freeman* v. *People, 4 Den. 9.*

In the above-cited case Justice Beardsley says, in discussing the New York statute with reference to its similarity with the common law rule:

"If, therefore, the person arraigned for a crime is capable of understanding the nature and object of the proceedings going on against him, if he actually comprehends his own condition in reference to such proceedings and can conduct his defense in a rational manner, he is, for the purpose of being tried, deemed sane, although on some other subjects his mind be deranged or unsound."

During the hearing, which lasted five days, the testimony of eleven physicians and three laymen was heard, and, in addition to their evidence orally, the transcripts of at least four physicians, containing their examinations of the defendant in the form of questions and answers, were read into the record. The hospital record concerning the prisoner during his confinement at Overbrook from March 12th, 1925, until his leaving there on June 28th, 1925, together with the report of Dr. Slocum, in charge of the Craig House, Beacon-on-the-Hudson, at which place the defendant stayed from July 18th, 1923, until September 29th, 1923, were also introduced as evidence. Of necessity, the hearing made relevant considerable evidence as to the defendant's mental state prior to the third day of September, 1925, at which time

Pierce met his death, but not on the theory that the defendant's state of mind, as found prior to that time, would be conclusive or dispositive of the case under the issue as framed. Therefore, the order of the juvenile court committing the defendant, under date of March 24th, 1925, may be treated only as evidence in the case justifying Noel's admission to Overbrook Hospital pursuant to an order made by a court of competent jurisdiction. Neither the findings of that court nor the evidence supporting its conclusions are binding on this court in this inquiry.

A complete incorporation of the medical testimony would serve no purpose in this memorandum. However, a few excerpts of the testimony will be noted.

Dr. LeRoy G. Kirkman, a physician of splendid reputation, examined the defendant on five occasions, the first on the 12th of September and the last on the 19th. He is of the opinion that the defendant is mentally capable of appreciating the predicament he is in, predicating his views upon the story the defendant told him touching upon the happenings of the crime and not finding that he is suffering from any delusions or hallucinations or confusion in his mental processes.

Dr. Edward W. Markens, the physician at the jail, is of the same opinion, it being based upon an observation of the defendant from day to day at the Essex county jail.

Dr. Walter S. Washington, an alienist, examined the defendant at the court house on September 10th. The entire examination, in the form of questions and answers, was offered in evidence in addition to his oral testimony on the stand. Dr. Washington found his apprehension was good, his orientation perfectly normal, his memory, especially for recent events, was remarkably good, and that he gave a connected, coherent statement of his personal history and family history. In answer to the specific question why he left Harvard College, he said he left there to earn money; that he was envious of the students because they had a lot of money. In response to the question whether or not he though it was wrong to shoot people and kill them his answer was, "yes."

Dr. Ambrose F. Dowd, a specialist in nervous and mental cases, was offered by the state, and testified as to three examinations of the defendant made by him at the county jail. As the result of these examinations, he is of the opinion that the defendant appreciates his predicament, and that he can aid counsel in the prepartion of a defense. One of the examinations of the defendant by Dr. Dowd was the day after he was brought to the court house to plead. He detailed to Dr. Dowd the happenings, and in response to this question by Dr. Dowd, "Did you expect to plead to a charge?" answered, "Yes. I was to plead to a charge for murder and kidnapping. Q. But you did not plead? A. No. The lawyers are going to renew their argument on Monday. I don't know whether I will be taken down or not. Q. How are you gong to plead? A. It doesn't make any difference how I plead. They have my signed confession. Captain Mason has it."

Another witness, Dr. Christopher C. Beling, an alienist of reputation, examined Noel on the 21st and 22d of September. He, too, is of the opinion that the defendant is mentally capable of appreciating and realizing the predicament he is in: that he is charged with murder, and that he is mentally capable of aiding his counsel in the preparation of a defense. Dr. Beling's examination was, in part, as follows: "I asked him how he came to do what he had done and he said, 'Well, do you want me to tell you? I planned to get the money.' I said, 'You tell me your story,' and then he started to tell me what he did. He said that after he had committed the crime—he said after he had killed the little girl, he had gone to the bank—he had gone to the post office and deposited a postal card informing an Edward Brown that they must get the money the next day and take the eight twenty-two train in the morning going to Philadelphia, and when they saw a red balloon at the railroad track they were to throw this money out, $4,000. He said he had gone there and waited and had held up the balloon and nobody threw the money, so he came back. I asked him, 'How did you conceive this idea of taking this child, kidnapping this child

for ransom?' 'I remember,' he said, 'the Philadelphia case where two men used a buggy and kidnapped a child. Of course, I did not use a buggy.' He said, 'I used an automobile.' I asked him also how he felt about himself, as far as his own health was concerned, and he said, 'I feel all right.' He said, 'I never felt right ever since they did a puncture on my spine in the hospital, and when I came out of the hospital I felt that the top of my head was off. I had a sensation in my head.' He said when he went to the hospital he was all right, he knew everything that transpired in the hospital, except for a few days, when he was very much excited, when he did not have his clear recollection. I asked him if he knew that it was wrong to kill a child and he said, 'Yes, I know it is wrong.' I said, 'Why did you kill her?' 'Because I did not want to be seen with her. If I had been seen with her they would have got me.' I said, 'Do you know what the punishment is for killing a person?' He said, 'Yes, it is the electric chair.' "

On cross-examinations all of the physicians called by the state, with the exception of Dr. Markens and Dr. Washington, testified that the defendant was suffering from dementia praecox, but, with all of this, they were of the opinion that a dement praecox could appreciate circumstances surrounding him and could rationally consult with counsel.

Dr. George Davies, a physician of experience in mental cases, testified on behalf of the defendant. His first contact with him was February 25th. On that occasion he made an examination of Noel and was one of the physicians to certify to the temporary commitment at Overbrook. Dr Davies made an examination of the defendant on the 30th of September, during the progress of this hearing, accompanied by Dr. Thompson. The defendant detailed his whereabouts to Dr. Davies from the time he left the hospital in June. In response to a question by Dr. Davies concerning the killing of Pierce, the defendant said he remembered it. The doctor testified that all through his examination he encountered much difficulty in getting answers from the defendant due to his hesitation in replying. He did say, as a reason for kill-

ing Pierce, that he needed the automobile, and that if the decedent had been a white man he would have killed him just the same. He told the doctor that the place of killing was in a quarry. He further told the physician that he remembered killing a little girl, and he thought it would do him a lot of good, and that it would make him like other people and make him enjoy talking like other people. He was further asked if he realized that he could be punished for what he did, and he said he was told that he would be liable to be punished by death for it. As a result of this examination and his knowledge of the defendant, Dr. Davies is of the opinion that he is not able, rationally, to consult and assist counsel in the preparation of a defense, and he is suffering from dementia praecox. The doctor defined dementia praecox as a term applied to a group of mental cases characterized by mental deterioration.

Dr. Thompson examined the defendant on the 28th, at the time of Dr. Davies' examination. Dr. Thompson, at this examination, asked if they tried to harm the defendant at Overbrook, to which the defendant answered: "I used to think so, but I do not think so now." The defendant further said that he thought they were trying to make a superior being out of him, and that he thought he was a superior being; that he thought he was a second Christ. The doctor further questioned him as to whether or not he felt at any time in his past life up to the present time that he was mentally deranged or of an insane mind. The defendant said that he believed that at periods when he was in Overbrook and periods before that, but to-day he does not know whether his mind is sound or not, and he does not think that his mind was sound at the time of the commission of the crime.

Dr. William B. Pritchard, an alienist practicing in New York City, produced by the defense, testified that he was introduced to the defendant at the county jail by Mr. Barber. The witness further testified that he explained to Noel that he was a specialist, and that the purpose of his visit was to form an opinion as to the mental condition of the defendant, and that he asked the defendant if he knew who his counsel

was, to which the defendant answered, "Mr. Lane." Dr. Pritchard is of the opinion that the defendant is insane and is a dement praecox and lacks capacity to rationally appreciate the circumstances or the position he is in, and that he cannot consult or advise with counsel. He predicates his opinion upon a history of the case as indicated by the records at Overbrook and an examination of the defendant himself.

Dr. Frederick C. Horsford, a physician of reputation, practicing in the city of Newark, was also called by the defense. He made an examination of the defendant on September 28th and reached the conclusion that the defendant was insane and suffering from dementia praecox; that he could not rationally appreciate the situation he was in, and that he could not rationally consult with counsel and assist in the preparation of a defense.

Dr. McDonald, of national reputation, examined the defendant at the county jail September 22d. He, too, concluded that the defendant was insane, basing this opinion upon the personal examination and an examination of the history of the defendant while at Overbrook Hospital and while at Beacon, New York, and that he was suffering from dementia praecox, and that the defendant's reason was impaired so that he could not rationally advise counsel or assist in the preparation of his trial. At the time of Dr. McDonald's visit to the jail, Mr. Barber introduced Dr. McDonald. Comment on this is later noted.

As pointed out, the court is not called upon to determine whether or not the defendant was insane at any time prior to or at the time of the commission of the offense with which he is charged, and, assuming that the record shows that the defendant was suffering from some form of insanity justifying his commitment to Overbrook under date of March 24th, 1925, the language of the chief-justice in *State* v. *Spencer, 21 N. J. Law* (at *p. 202*), is pertinent:

"Proof that a man has at some former period of his life been afflicted with such insanity as would render him an unaccountable being, and exonerate him from punishment, is not sufficient, if it also be proven, or comes out in the evi-

dence, that he has at any time since been so far restored to his right mind as to be capable of.moral action and of discerning between right and wrong. Otherwise, a man who had once been out of his right mind, might ever afterwards commit any crimes he chose without being held responsible for it. If it were true' that insanity never left a man after once clouding his mind, then it would be enough to exculpate him to prove that he had once been insane. But it often occurs that men have turns or "spells" of insanity, and then enjoy intervals of entire soundness of mind. Now, although they would be excusable for what they did in a paroxysm of madness, they are by no means excusable for what they do when they have their senses."

In *United States* v. *Chisolm, 149 Fed. Rep. 284,* the question was presented whether one not entirely sane could be put on trial in a criminal case. The court held there that if he comprehends his own position with reference to the proceedings, and has such possession and control of his mental power, including the faculty of memory, as will enable him to testify intelligently and give his counsel all the material facts on the criminal act charged against him, he was subject to trial.

It was also held, discussing capacity and comprehension, that mere incapacity to fully understand legal rights, and to make known in an intelligent manner to his counsel all the facts material to the defense, is not a sufficient ground for refraining from proceeding to trial. *State* v. *Arnold, 12 Iowa 479.*

In *United States* v. *Chisolm, supra,* the court said:

"It is impossible to lay down any fixed rule, as a matter of law, as to any particular state of facts which will unerringly demonstrate sanity, or the contrary condition of the human mind, or the degree of aberration which, when found to exist, exempts an accused person from criminal responsibility, or unfits him to rationally aid in his defense, when arraigned for a crime. * * * But whether or not an individual's departure from general rules governing

human action demonstrates such aberration of mind as exempts him from criminal responsibility, or shows unfitness on that account, to be placed on trial, depends upon the circumstances of the particular case; and is to be gathered, not merely from the act for which he is arraigned, but must also be determined and tested in view of every other fact and circumstance which sheds light upon the condition of the defendant's mind at the period as to which the inquiry is directed." See *3 A. L. R. 95, 96*.

The term to consult with counsel, or to consult with anyone, is a relative one. To what degree one may consult with another is more or less dependent upon the subject-matter and the information on the given subject.

The supreme judicial court of Maine said: "To consult is to apply for direction or information, to ask for advice, to discuss something together, to deliberate." *Hewey* v. *Metropolitan Insurance Co., 62 Me. 600*.

A careful reading of the testimony, aided by my observation and conversation with the defendant, and not being unmindful that the physicians, both for the state and defense, are of the opinion that the defendant is suffering from some form of mental deterioration at this time, leads me to the conclusion that the defendant's appreciation of his predicament is apparent, and that he comprehends his position with relation to the crime charged against him.

It has been urged that no reliance could be placed upon anything that he might tell counsel, but the court has no way of determining that at this time. The testimony, both in the form of the transcripts marked in evidence and the oral testimony of the physicians for the state and the defense, is replete with responsive answers to questions propounded to the defendant. The statement made by him to the prosecutor's office was examined into and many facts were found to exist in keeping with the statement. It seems to the court that the solution of this matter up to the stage of this hearing has been due to the reliability of the defendant's story as told by him.

There has been much stress laid upon the defendant's muteness, both as a symptom of dementia praecox and as a hindrance to counsel in the preparation of his defense, and, while there was much hesitation in the defendant's answers to the various questions put to him, it seems Mr. Howard C. Barber, associate counsel, had little difficulty in conferring with the prisoner. At the time of introducing Dr. MacDonald to the defendant on the 22d of September, he said: "This is really the first private conference we have had. Dr. McDonald wants to talk to you, and I want you to talk to him just as you would talk to me." The answers to Dr. McDonald's questions following this conversation seems to have been freely made, and they lacked the hesitancy which characterized some of the questions put to him at other examinations.

As pointed out at the beginning of this memorandum, the issue here is a narrow one, and, deciding the precise question framed, this court is of the opinion that the prisoner is able to comprehend his position and to make a rational defense.

Therefore, he is remanded, with a direction that his guilt or innocence under this indictment shall be determined by a jury.